# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,          : 25-cr-00281-BMC
                                   :
                                   :
    - versus -                     : U.S. Courthouse
                                   : Brooklyn, New York
HOWARD RUBIN, JENNIFER POWERS,     :
                                   : September 26, 2025
               Defendants          : 5:14 p.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
BEFORE THE HONORABLE PEGGY KUO
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**

<u>**For the Government**</u>:      **Joseph Nocella, Esq.**
                          Interim United States Attorney

                     BY:  **Tara B. McGrath, Esq.**
                          **Raffaela Belizaire, Esq.**
                          Assistant U.S. Attorneys
                          271 Cadman Plaza East
                          Brooklyn, New York 11201

<u>**For the Defendant**</u>:      **Benjamin E. Rosenberg, Esq.**
                          Dechert LLP
                          Three Bryant Park
                          1095 Avenue of the Americas
                          New York, NY 10036

<u>**Transcription Service**</u>:  **Transcriptions Plus II, Inc.**
                          61 Beatrice Avenue
                          West Islip, New York 11795
                          RL.Transcriptions2@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  We have a Criminal Cause for

2    arraignment on an indictment, 25-cr-281, *The United*

3    *States v. Howard Rubin.*

4          Counsel, starting with the government, please

5    state your appearances for the record.

6          MS. MCGRATH:  Good afternoon, your Honor.  Tara

7    McGrath and Raffaela Belizaire for the government.

8          MR. ROSENBERG:  Good afternoon, your Honor.

9    Benjamin Rosenberg (inaudible) defendant.

10          THE COURT:  All right.  Good afternoon,

11    everyone.

12          THE CLERK:  Can you speak into the microphone,

13    please?  The second microphone.  Pull it closer to the

14    defendant.

15          MR. ROSENBERG:  I'm sorry?

16          THE COURT:  The second microphone, can you put

17    it -- yes.

18          THE COURT:  Good afternoon, Mr. Rubin.  The

19    purpose of the proceeding today is to make sure you

20    understand your rights and what you're charged with, and

21    to determine whether you should be released on bail or

22    held in jail.

23          You have the right to remain silent.  You don't

24    need to make any statements.  If you've made any

25    statements, you don't need to make any more.  If you

3

Proceedings

1  start to make a statement, you can stop at any time.  Any

2  statements you do make can be used against you.  Do you

3  understand?

4              THE DEFENDANT:  I do.

5              THE COURT:  If you can't afford an attorney,

6  the Court will appoint an attorney to represent you, but

7  I understand that you have retained counsel.

8              THE DEFENDANT:  Correct.

9              THE COURT:  Okay.  You've been charged in a

10  grand jury with sex trafficking in two counts.  The first

11  count is with regard to five individuals.  The second

12  count is in regard to one individual.

13              You also have been charged in seven counts of

14  Mann Act transportation and also with one count of bank

15  fraud.

16              Did you receive a copy of the indictment?

17              THE DEFENDANT:  My attorneys have received a

18  copy.

19              THE COURT:  All right.  And did you have a

20  chance to see it?

21              THE DEFENDANT:  I discussed it with my

22  attorneys.

23              THE COURT:  Okay.  And do you understand what

24  you're being charged with?

25              THE DEFENDANT:  I do.

4

Proceedings

1          THE COURT:  Do you want me to read the charges

2     out loud or do you waive a public reading of the

3     indictment?

4          THE DEFENDANT:  I waive a public reading.

5          THE COURT:  And how do you plead to the

6     charges; guilty or not guilty?

7          THE DEFENDANT:  I plead not guilty to all

8     charges.

9          THE COURT:  All right.  Thank you.  I will take

10    this opportunity pursuant to Federal Rule of Criminal

11    Procedure 5(f) to remind the prosecution of its

12    obligation under *Brady v. Maryland* and its progeny to

13    disclose to the defense as soon as reasonably possible

14    all information whether admissible or not that is

15    favorable to the defendant material either to guilt or to

16    punishment and known to the prosecution.

17          Possible consequences of noncompliance may

18    include dismissal of individual charges or the entire

19    case, exclusion of evidence, and professional discipline

20    or court sanctions on the attorneys responsible for the

21    noncompliance.

22          I will be entering a written order that more

23    fully describes this obligation and the possible

24    consequences of failing to meet it and I direct the

25    prosecution to review and comply with that order.

5

Proceedings

1    Does the prosecution confirm its understandings

2    and obligations and will fulfill them?

3    MS. MCGRATH:  Yes, your Honor, we understand

4    them and we will comply.

5    THE COURT:  All right.  Thank you.

6    I understand that the government is seeking

7    detention in this case, so I'll hear you on that motion.

8    MS. MCGRATH:  Yes, your Honor.  So there is a

9    presumption of detention in this case given the nature of

10   the charges.  We have filed quite a detailed detention

11   memo outlining the nature of the conduct and the

12   defendant's history and circumstances.  We won't belabor

13   all those points there, but I do want to stress just a

14   few things.

15   There's a clear risk to victim safety and

16   obstruction.  The nature of the crime demonstrates that.

17   The defendant for years brutalized women even when they

18   asked him to stop and even when they were unconscious.

19   The aftermath of those crimes is also very

20   telling.  He attempted to obstruct justice and tamper

21   with witnesses.  His co-defendant, Jennifer Powers, told

22   a victim to lie to the police to protect their names

23   which that victim did.  The defendant attempted to bribe

24   another victim to get her to drop charges.  In a 2019

25   letter he threatened to publically shame Jane Doe number

6

Proceedings

1  5 when he learned she was going to be bringing a case

2  against him and to pursue sanctions.  He hired a private

3  investigator to investigate some of the women that he was

4  involved with and he pursued a hitman on the dark web to

5  target women who had filed civil litigation.

6           This case doesn't just involve the ten Jane Doe

7  that are named.  The defendant will soon learn in

8  discovery that there are dozens of other victims that the

9  government is aware of who are not yet included in

10  charges.

11          And his network was also more expansive than

12  just the victims.  He relied on at least ten other

13  individuals to recruit women and to facilitate his crime.

14  He poses a danger both to the safety and for obstruction

15  with respect to all of those people.

16          As the Court is aware, dangerousness as

17  encompassed in the Bail Reform Act also includes prospect

18  of the defendant's continued criminality.

19          And here, we see that the defendant was

20  undeterred after he was sued civilly.  He was sued

21  civilly in late 2017 and his sex crimes continued.  He

22  trafficked Jane Doe number 6 in 2018, a year later, and

23  he continued to engage in criminal and sexual acts with

24  Jane Doe number 7 during 2019.

25          His financial crimes continue to this day.  In

7

Proceedings

1    2020 and 2022 he made brazen lies to a bank to help his

2    co-defendant secure her mortgage.  And according to his

3    tax filing from just last month, the defendant has failed

4    to disclose to the IRS millions of dollars he has

5    provided to Jennifer Powers and her family.

6          The defendant also presents a very significant

7    risk of flight.  And there are two points that are

8    included in our memo that we just learned about earlier

9    today that we also want to flag.

10          The defendant would not tell law enforcement

11    where his passport was, so we do not presently have that.

12    And at his home, he had eight cell phones.  Three of them

13    are scattered around the kitchen and two of them were

14    underneath different boxes.  There are also three

15    Blackberries.  Perhaps those were old, but the five other

16    cell phones were iPhones.  This is very unusual conduct

17    for a person and suggests that he's switching cell phones

18    to evade detection.

19          He's also been dishonest about his financial

20    picture not only given his lies to the bank but also even

21    to pretrial since he reported to Pretrial that he had

22    wealth of $49 million including a life insurance policy

23    of 35 million.  But in 2024, he had almost 75 million in

24    one second account in the Cayman Islands so there's no

25    explanation for this $40 million difference.  And

8

Proceedings

1 certainly we do not believe that this unsworn and

2 untested report of his finances is complete either.

3          We know that the defendant has very significant

4 assets overseas which makes him a considerable flight

5 risk and we do not today have any real transparency as to

6 just what his wealth is.

7          We also want to stress the strength of the

8 case.  The defendant was found liable in the civil case.

9 He testified at a deposition and at trial and he admitted

10 his guilt on the Mann Act transportation counts here.  He

11 admitted that he paid women for (indiscernible) sex acts

12 and that many of them traveled from out of state.  And

13 indeed, financial records and flight records confirm as

14 much.  Each of those counts carries a statutory maximum

15 of ten years.

16          We submit the defendant's role on the bank

17 fraud charge is also overwhelming.  He's embroiled in

18 civil litigation attending depositions and testifying at

19 the trial himself and all the while telling the bank that

20 he wasn't party to litigation.

21          The evidence on the sex trafficking charges is

22 incredibly powerful.  As we've detailed in our

23 memorandum, there are ten Jane Doe victims, six of whom

24 he trafficked.  And the evidence corroborating them

25 includes site records, financial records, text messages

9

Proceedings

1   in which the defendant is anticipating the harm he's

2   going to cause them and then recounts to his co-defendant

3   how violent it had gotten, videos and images of their

4   bruising, and in some instances their need to seek

5   medical treatment.

6          On those counts, the sex trafficking count, the

7   defendant faces 15 years minimum and his guidelines are

8   significantly higher.  We estimate his guidelines on the

9   trafficking counts to be 324 to 405 months.

10         All of that gives the defendant an extremely

11  powerful incentive to flee particularly where there's

12  nothing we see tethering him to this country.  He lives

13  alone in Connecticut.  He's estranged from his wife.  Our

14  understanding is she had filed for divorce from him

15  during the civil case.  He's not been employed for many

16  years and he has extraordinary wealth overseas.  It would

17  cost him no hardship at all to pick up and flee to a

18  country that does not extradite.

19         For all those reasons, your Honor, and in light

20  of the presumption in this case, we firmly believe that

21  there are no conditions or combinations of conditions

22  that can do the two things that the Bail Reform Act

23  focuses on and that's ensuring the safety of the

24  community and ensuring the defendant's appearance in

25  court as required.

10

Proceedings

1        THE COURT:  All right.  Thank you.  I'll hear

2   from the defendant.

3        MR. ROSENBERG:  Can I have one moment, your

4   Honor?

5        THE COURT:  Yes, please.

6              (Pause in proceedings)

7        MR. ROSENBERG:  Thank you, your Honor.  Forgive

8   me, your Honor.

9              (Pause in proceedings)

10       MR. ROSENBERG:  Forgive me, your Honor.  May it

11  please the Court.

12       THE COURT:  Yes, go ahead.  Please move the

13  microphone a little bit closer to you.

14       MR. ROSENBERG:  Of course, your Honor.

15       THE COURT:  Thank you.

16       MR. ROSENBERG:  Your Honor, I would submit that

17  consideration of the evidence that we have to date

18  suggests, and the allegations suggest and demonstrate

19  that Mr. Rubin is neither a flight risk nor a danger to

20  the community such that there couldn't be conditions of

21  bail imposed that would both ensure his return to court,

22  as he's always done, and the safety of the community.

23       Now, I begin with the flight risk because my

24  colleague and the government said that there's nothing

25  tethering him to this country.  That is -- the record

11

Proceedings

1  belies that completely.

2          Mr. Rubin is a 70-year-old man.  He has a wife.

3  She has filed for divorce.  They continue to be amicable

4  and to interact with one another throughout the week and

5  continually.  I'll get in a moment to her support for him

6  in this instance.

7          He also has, far from being not tethered to the

8  country, he has three children, one of whom lives in

9  Manhattan, one in Texas, and the third in Connecticut

10  near where he lives.  That is particularly significant.

11  She lives with her husband and three children.

12          Mr. Rubin serves -- essentially takes care of

13  the children on a regular basis five days a week on

14  average.  He spends time with the children, you know, and

15  takes care of them, oversees them.

16          In addition, his daughter is pregnant, so

17  there'll soon be a fourth grandchild which will only

18  increase the work that Mr. Rubin does often with his

19  wife.  Mr. Rubin has -- because they have a joint

20  interest and care for their children and their

21  grandchildren especially.

22          In addition, Mr. Rubin has two grown brothers

23  who have families.  They live in New Jersey and in

24  Connecticut as well.  Mr. Rubin has no family abroad.  He

25  has no ties abroad.  He has no homes out of the country.

12

Proceedings

1    And he hasn't left the country in the past approximately

2    eight years according to the pre-sentence report and what

3    we understand.

4              In addition, Mr. Rubin has been aware of this

5    investigation for almost a year, certainly since late

6    2024, and he has never remotely made any effort to avoid

7    it, evade it, or to escape.

8              This testimony, or excuse me, not testimony,

9    this reference to a foreign account, an account, and I'll

10   only note that that is an account of long standing that

11   Mr. Rubin has had.  It was not created to prepare to flee

12   or anything of that nature.  It's been for --

13             THE DEFENDANT:  25 years.

14             MR. ROSENBERG:  Up to 25 years.  A long time

15   he's had that.

16             THE COURT:  How much money is in that account?

17             THE DEFENDANT:  Approximately 35 million.

18             THE COURT:  I hesitate to hear your client

19   speak.  Maybe, Mr. Rosenberg, you can speak.

20             THE DEFENDANT:  Oh, I'm sorry.  Yes.

21             MR. ROSENBERG:  Forgive me, your Honor.

22             THE COURT:  No, that's okay.

23             MR. ROSENBERG:  He beat me to the punch.

24             THE COURT:  Of course.  And so $35 million in

25   the Cayman Islands?

13

Proceedings

1          MR. ROSENBERG:  It is an investment -- it's an

2    insurance company that is incorporated in the Cayman

3    Islands and the insurance company is Crown --

4          THE DEFENDANT:  Global.

5          MR. ROSENBERG:  -- Global.

6          THE COURT:  All right.  So this is the $35

7    million in insurance, life insurance, that existed in

8    their financial records?

9          MR. ROSENBERG:  That's what we understand, your

10   Honor.

11         THE COURT:  Okay.  Go ahead.

12         MR. ROSENBERG:  And as I said, that is of long

13   standing and not moved to prepare for invasion or

14   anything like it.

15         For those reasons we submit that there are

16   strong ties that tether him to be community.  And as

17   we'll show, you know, we propose a bail package to

18   suffice to guarantee his, to assure his return to court.

19         Now, in terms of the question as to his danger

20   to the community, of course Mr. Rubin -- forgive me, let

21   me go back for one moment.  Another point to make in

22   connection with his risk of flight, his health condition.

23   As is reported here in the Pretrial Services report in

24   July Mr. Rubin suffered a stroke.  He is currently under

25   the care of doctors and he's taking the medicines listed

14

Proceedings

1  there including blood thinners, beta blockers, and he's

2  under the care of physicians all of which makes him

3  especially unlikely to leave and to flee.

4         Now, with respect to the danger to the

5  community, of course Mr. Rubin, 70 years old, has no

6  criminal history whatsoever.  The conduct that is alleged

7  here, the principal conduct, took place in the years

8  before 2019.  That's the allegedly violent contact.  The

9  conduct took place before 2019.  Since then, apart from

10  the allegations about two statements to a bank in 2020

11  and 2022 I believe, there is no allegation of any

12  wrongdoing or anything other than a law-abiding citizen.

13         The government's letter refers to and its

14  comments here refers to the plaintiffs or victims,

15  alleged victims who have come forward.  And as the Court

16  knows and is referred to in some of the government's

17  materials there was a civil case.  Many of the people in

18  the civil case were the same ones who we suspect are

19  referred to in the criminal case.  And in each case those

20  people came forward, testified fully.  No one was

21  intimidated or prevented from testifying.  Those are all

22  people who are known to Mr. Rubin.

23         And the allegations here are that he mistreated

24  women who were known to him.  This isn't a case involving

25  harm to strangers or anything of that nature.  And I

15

Proceedings

1   submit that given the evidence, that none of these people

2   was intimated.  All of them were able to testify.  And

3   Mr. Rubin appeared in court every day and faced his

4   accusers, that there's no evidence of any witness

5   intimidation or threats to any, or credible threats, to

6   any witness or victim.

7           We also note that there is a finding of

8   liability against Mr. Rubin and that is on appeal and has

9   been argued in the Second Circuit and is currently sub

10  judice before it.

11          Based on those points, your Honor, we would

12  submit that yes, there are conditions that would suffice

13  to assure Mr. Rubin's return and the safety of the

14  community.  Those that we propose that he sign a $25

15  million personal recognizance bond, that it be secured by

16  his residence in New York.  He has a residence in New

17  York and he rents in Connecticut.  Those are the only two

18  places he is.

19          The residence in New York is a co-op which he

20  co-owns with his wife who has agreed, as indicated in the

21  Pretrial Services report, to cosign the bond.  And it

22  would be secured by that.  That is worth we estimate as

23  best we can at this time approximately $8 million.

24          And in addition, that Mr. Rubin, he will of

25  course surrender his passport and that his travel be

16

Proceedings

1  limited to the Southern and Eastern Districts of New York

2  so he can meet with counsel and appear in court, and also

3  to the District of Connecticut where he spends the vast

4  majority of his time.  All of his time really.

5       And for those reasons, your Honor, we submit

6  that he should be permitted to have such a bail package

7  and be released on those conditions.

8       THE COURT:  All right.  Thank you.  The

9  government says that your client has not disclosed where

10  his passport is.

11      MR. ROSENBERG:  As I understand it, this is

12  news to us, that he didn't -- when he was asked about it

13  this morning he didn't.  I note here that he did tell

14  Pretrial Services and stated that it's located in his

15  apartment in Manhattan.

16      THE COURT:  Okay.  But he didn't -- was he

17  asked -- again, I don't want your client to answer in

18  open court, but was he asked where it was and declined to

19  say?

20      MR. ROSENBERG:  I do not know what he was asked

21  and what he said at that time.

22      THE COURT:  Okay.  And then the residence, you

23  called it a residence, but he doesn't live there in New

24  York, right?

25      MR. ROSENBERG:  He spends most of his time, the

Transcriptions Plus II, Inc.

17

Proceedings

1  vast majority, in Connecticut where he's rented a house

2  in order to be near his grandchildren and daughter and

3  her husband.  When necessary, he comes back to his

4  apartment that he owns jointly with his wife.  That is

5  her primary residence.

6           THE COURT:  Okay.

7           MR. ROSENBERG:  He spends more time, vastly

8  more, however, in Connecticut.

9           THE COURT:  I see.  All right.  And I am

10  concerned about his risk of flight and I'm also concerned

11  about the information about his attempts to intimidate

12  the witnesses.

13           Now, the fact that the witnesses came to court

14  and testified anyway speaks more to their strength and

15  their courage than to any attempts to intimidate them.

16  So, you know, if your client did try to intimidate them

17  but they came nonetheless, the fact that they came

18  nonetheless doesn't overcome your client's attempt to

19  intimidate them.

20           MR. ROSENBERG:  If I may, your Honor?  I

21  appreciate the point but I don't think that there's any

22  evidence other than some hearsay about that somebody said

23  that he tried to find a hitman which sounds completely --

24  I mean I have no idea whether there's good evidence of

25  that or not good evidence of that.  Certainly nothing

18

Proceedings

1  happened of course and there's no evidence, there's no

2  physical evidence that ever happened or what was said.

3          The other point that the government has made is

4  that he hired investigators.  But as your Honor is well

5  aware, in a civil case where there are allegations and

6  accusations it's quite common and quite proper and

7  appropriate to hire investigators to try to learn about

8  any number of things including the accusers.  I would

9  submit, your Honor, there's simply no hard evidence of

10  any intimidation.

11          THE COURT:  I thought that the witnesses

12  testified or provided their own information as to

13  attempts to silence them.  No?  You may not have been the

14  attorney at the civil trial.

15          MR. ROSENBERG:  Your Honor, as I sit here

16  today -- well I was, we were the attorneys in the civil

17  case.  I must say I do not recall any such testimony and

18  I don't recall in the government's letter them pointing

19  to any such testimony.

20          THE COURT:  So maybe I could ask the government

21  to clarify that.

22          MS. MCGRATH:  Yes, your Honor.  So we, as an

23  initial matter, a number of individuals reported, a

24  number of individuals who we would classify as victims of

25  the defendant's criminal sexual crimes, reported that

19

Proceedings

1    they thought they had been followed and that their

2    accounts had been hacked.  That is not limited to victims

3    in the civil case.  That also includes victims who are

4    not party to that suit.

5              Jane Doe number 7 informed the government that

6    the defendant told her that he had endeavored to find a

7    hitman on the dark web, that he succeeded in making

8    contact with that person to target the victims of the

9    civil case but did not ultimately pursue it.

10             Separately, the defendant filed a threatening

11   letter that he signed that he sent overnight to Jane Doe

12   number 5's parents' house when he learned she was going

13   to pursue litigation against him.

14             So we submit there's very credible evidence of

15   the defendant's obstructive behavior and attempts to

16   engage in witness tampering and that is a very

17   significant concern here particularly because so many of

18   the victims in our case, both the named Jane Doe's and

19   others that they'll learn about in discovery, have not

20   yet ever been party to litigation against him.

21             We would also like at an appropriate juncture

22   just to respond to some of the other points counsel

23   raised.

24             THE COURT:  Okay.

25             MS. MCGRATH:  I don't know if now's the

20

Proceedings

1    appropriate moment or if you had further questions.

2            THE COURT:  Okay.  Well, I just wanted

3    information about the business of the information with

4    regard to the intimidation.  But I think, Mr. Rosenberg,

5    you hadn't finished what you were saying or I'll give you

6    an opportunity.

7            MR. ROSENBERG:  Well, I'd like to respond to

8    those points if I may.

9            THE COURT:  Okay.  Go ahead.

10           MR. ROSENBERG:  Individuals reporting they

11   thought they'd been followed or their accounts have been

12   hacked.  I'm sorry, without any evidence of accounts

13   being hacked or anything to suggest Mr. Rubin was

14   following somebody or causing the following of somebody I

15   would submit that that is insufficient evidence of any

16   threat to any witness.

17           Jane Doe number 7 saying that Mr. Rubin said

18   something about hiring a hitman and not doing it, you

19   know, there's no evidence again.  If there was any

20   evidence of that happening or he searched on the web, the

21   government could get that evidence and there's absolutely

22   no suggestion that it has it.

23           And the letter to which the government refers,

24   if I recall correctly from the government's letter to the

25   Court threatening someone for bringing a case, there is

21

Proceedings

1   no threat of violence or harm in that case.  It was

2   threatening that I believe if she did it, her practice

3   and backgrounds would be exposed to the public.

4          THE COURT:  He did write a letter directly to

5   the witness.

6          MR. ROSENBERG:  He wrote to someone who he

7   anticipated might bring a case against him to say if you

8   do, then your nature and various things will be revealed.

9   That is correct.

10          THE COURT:  Okay.  And then there's also

11   information in the government's detention letter that

12   your client offered to -- they used the word payoff, one

13   of the I guess plaintiffs in this case.  Can you speak to

14   that?  Again, it's an effort to -- it could be seen as an

15   effort to obstruct or intimidate someone.

16          MR. ROSENBERG:  With respect, your Honor, I

17   think that the payoffs to settle cases are absolutely

18   appropriate.  I'm aware of such efforts.  I'm not aware

19   of any others.

20          THE COURT:  Okay.  All right.  Great.  Ms.

21   McGrath, I think this is an appropriate time for you to

22   continue.

23          MS. MCGRATH:  Thank you, your Honor.  And just

24   as to those payouts, they were discussed as between the

25   defendant and his co-defendant as a bribe, so I don't

22

Proceedings

 1  think that that was a settlement effort.

 2          Defense counsel suggests that the defendant has

 3  been aware of this investigation for a while.  Certainly

 4  there have been no time until today that he knew he was

 5  facing the prospect of very, very, very significant time

 6  in prison, a minimum of 15 years on each of the sex

 7  trafficking counts and a guidelines range up to the, you

 8  know, 400 months range.

 9          We are very troubled by his report to Pretrial

10  Services concerning his finances.  He repeated that his

11  insurance account has $35 million.  He reported to the

12  Internal Revenue Service in a foreign bank and financial

13  account report that as of 2024 that amount was 74.4

14  million.  So there's about 40 million that's unexplained.

15  How that dropped so significantly from that time to today

16  is very suspicious to us and we submit that there's

17  absolutely no transparency as to how much money he has.

18          The reason that's important of course is

19  because any bond amount has to be tethered to his overall

20  net worth.  For someone who has $30 million, a $25

21  million bond might be significant.  For someone who has

22  many, many millions more than that, it may not be

23  particularly here where the secured amount is just $8

24  million.  So if he does have $74.4 million in the Cayman

25  Islands, losing an $8 million property is nothing.  He

23

Proceedings

1  has multiples of that in one single foreign account.

2          We'll also note that he lied to Pretrial

3  Services about his drug use.  We have text messages in

4  which he is talking about recreational drug use including

5  purchasing prescription drugs from one of the victims.

6  He claims he used cocaine once during the incident with

7  Jane Doe number 5.  His apartment was littered with

8  cocaine.  And in fact, that's something that his co-

9  defendant, Jennifer Powers, was very concerned about when

10 the police arrived having the drugs.

11         In terms of his medical condition, of course he

12 was required to go to the hospital today and that is part

13 of the reason for the delay, and they found that he was

14 fit for confinement.  We can both see him today in open

15 court and certainly he's not suffering from any condition

16 that the MDC and the BOP are not capable of addressing.

17         Defense counsel suggested that the wrongdoing

18 is historic and that's simply wrong.  As we've written

19 about in our paper and as I submit again today, the

20 defendant continues to lie to the Internal Revenue

21 Service about his wealth and about his payments to

22 Jennifer Powers.  And the most recent filing to the IRS

23 was just last month.  So the criminality here has

24 continued and we also are concerned that any obstructive

25 efforts or witness tampering will of course constitute

24

Proceedings

1   new crimes and that could very well continue into the

2   future.

3          And the final thing also is that victims are

4   extremely fearful of the defendant.  Universally, they

5   have revealed as much to us.  So the notion that, you

6   know, that the underlying conduct and the dangerousness

7   has passed is not wrong and it's certainly not wrong as

8   to them.

9          So unless the Court has any further questions

10  for us at this moment, we'll rest on our oral submission

11  and on our written submission.

12         THE COURT:  All right.  Thank you.  And Mr.

13  Rosenberg, I'll ask if you have anything else you want to

14  say?

15         MR. ROSENBERG:  Yes, your Honor.  On the

16  question of how much money is in the Cayman account, my

17  understanding is there's 75, but there are $40 million

18  worth of loans that have been taken out against it, which

19  leaves 35 million of equity.  So that may explain.  I

20  don't know what the representation was that is referred

21  to by the government, but that would explain why the

22  amount of equity is that amount.

23         There's a reference here to lies to the IRS as

24  recent as the past month.  We haven't seen any of that.

25  We just have a statement, a government written letter,

25

Proceedings

1  but there's no evidence of that.  We haven't seen what

2  was said or any analysis of what needed to be said or

3  not.  So I submit that's not probative here.

4        And the fact that the victims contend they're

5  fearful of the defendant, the fact of the matter is that

6  any of the sexual activity that's alleged here, there's

7  nothing alleged since 2019.  There's been no harm to any

8  person certainly since that date.  And for that reason I

9  think that he's not a danger to the community.

10       THE COURT:  All right.  Thank you.  All right.

11  Well, I'll start with the government's representation or

12  argument that this is a presumption case.  So I think we

13  all agree on that.  And I find that the defendant has not

14  overcome the presumption.

15       This is a very serious set of criminal

16  allegations against Mr. Rubin that spanned several years

17  and all the multiple victims.  The allegations are of

18  very violent behavior and he faces very serious criminal

19  penalties should he be found guilty on one of these, let

20  alone on multiple counts.

21       So we'll start there.  The evidence as set

22  forth does appear to be strong.  I was struck it's

23  slightly unusual to have a civil case precede a criminal

24  case, but nevertheless, there was a civil trial and so

25  there was testimony elicited under oath at that point.

26

Proceedings

1   And regardless of the outcome of whatever the Second

2   Circuit may say, there is a factual record of what

3   happened here.  And so to that degree, I think the

4   evidence is strong against Mr. Rubin.

5            Than in terms of the safety of the community,

6   there is indication of threats being made to witnesses.

7   I do not know the degree of the evidence with regard to

8   the hitman.  There's an allegation that it came from a

9   specific witness.  And then it sounds like there's

10  specific information as to the use of the dark web.  So

11  it does not appear to be speculation.

12           And so for purposes of making a finding at this

13  point, that information combined with the other

14  allegations of approaches to witnesses in a trial, which

15  sound at the very least inappropriate, settlement

16  discussions are usually between counsel and not directly

17  between parties in a situation where physical abuse and

18  threats have happened in the past.  So direct contacts of

19  that nature against witnesses and victims also appear to

20  be improper.

21           So all of these things together, the

22  multiplicity of the threats and attempts to obstruct

23  justice show me that Mr. Rubin continues to be, or poses

24  a threat to the community that cannot be addressed by any

25  bond conditions.

27

Proceedings

1          And then I will also add that I am very
2   concerned about the risk of flight.  The passport has not
3   been -- was not turned over to the government.  The
4   government has represented that Mr. Rubin was requested
5   to turn over his passport or at least tell them where it
6   was, and I can't imagine that a person wouldn't know
7   where his passport is or where his important papers are
8   located.

9          The government also represented that there were
10  several cell phones in boxes, three Blackberries.  These
11  were not addressed in defense counsel's representations
12  to the Court.  And so this information also shows state
13  of mind of Mr. Rubin which is that he is planning or
14  trying to evade something.  And certainly all of those
15  cell phones could be used to evade the authorities if
16  he's released even under house arrest.

17         And the money in the Cayman Islands, whether
18  it's $75 million or $35 million, is a lot of money
19  offshore and so it does show that he has an ability to
20  access money that could enable him to flee and go
21  someplace else and evade the authorities.

22         As to the point that he has been aware of the
23  investigation for some time, being arrested really
24  focuses a person's mind and makes it real.  So I think
25  that what I'm looking at is what happens from this point

28

Proceedings

1   forward.  And given the evidence with regard to his

2   ability to flee and his state of mind that would enable

3   to contemplate fleeing cause me to think that, or to

4   conclude that by a preponderance of the evidence that he

5   is a risk of flight.

6          So all of these things count in favor of

7   detention for Mr. Rubin.

8          Now, if anything changes and defendant wants to

9   make an application to be released on bond, you're always

10  free to do that, Mr. Rosenberg.  But for today, I find

11  that there are no conditions or set of conditions that

12  will ensure Mr. Rubin's appearance in court or the safety

13  of the community.

14         As to his health, I'll certainly let the MDC

15  know of his prescriptions.  If you have copies of the

16  prescriptions, please provide those.  We do have a

17  medical form for you to fill out.  I don't know that

18  they'll let him take the prescription drugs directly into

19  the facility, but certainly they should be made aware of

20  his medical condition and what treatment he needs.  And

21  if there are any problems with that regard, please bring

22  that to the attention of the Court.  But this is my

23  decision.

24         So is there anything else from the government?

25         MS. MCGRATH:  Your Honor, we have submitted an

29

Proceedings

1  order of excludable delay seeking to exclude time between

2  now and October 20th which is the date of the first

3  status conference and in the interim we'll seek a

4  protective order and begin with production of discovery.

5          THE COURT:  Okay.  And Mr. Rosenberg, have you

6  discussed this with Mr. Rubin?

7          MR. ROSENBERG:  We did.  I have not been able

8  to discuss it with Mr. Rubin.  We agreed with the

9  government to exclude the time till October 20th.

10          THE COURT:  You have or have not had a chance

11  to discuss this?

12          MR. ROSENBERG:  Not had a chance to discuss it

13  but I believe that I was allowed to do so as his agent to

14  make the agreement to exclude the time.  But if may have

15  a moment to speak to confirm that --

16          THE COURT:  Oh, please do.

17              (Pause in proceedings)

18          MR. ROSENBERG:  Your Honor, I have conferred

19  and confirmed that we can agree to that.

20          THE COURT:  Okay.  So just to make the record

21  clear, Mr. Rubin, under the Speedy Trial Act, you're

22  entitled to a trial within 70 days.  But your lawyer and

23  counsel for the government are asking the Court not to

24  count the time between now and October 20 so that they

25  can exchange and review the evidence in your case.  I

30

Proceedings

1    understand there's a lot here and so they need extra time

2    to go through it.  So the time between now and October 20

3    will not be counted if that is something that you're

4    amenable to.

5            THE DEFENDANT:  Yes.

6            THE COURT:  Okay.  So I find given the

7    voluminous discovery in this case that the ends of

8    justice served by excluding the time between now and

9    October 20 and I'll sign this order of excludable delay.

10   All right.  Anything else?

11           MS. MCGRATH:  No, your Honor.  Thank you.

12           THE COURT:  Mr. Rosenberg, anything else for

13   the defense?

14           MR. ROSENBERG:  Nothing, your Honor.

15           THE COURT:  All right.  Thank you very much.

16   Thank you, Mr. Rubin.

17                    (Matter concluded)

18                         -oOo-

19

20

21

22

23

24

25

31

# C  E  R  T  I  F  I  C  A  T  E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **29th** day of **September**, 2025.

*Mary Greco*

Transcriptions Plus II, Inc.