

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EMR:TBM/RSB                     *271 Cadman Plaza East*
F. #2017R01960                  *Brooklyn, New York 11201*

December 10, 2025

**Request to Partially Seal**

<u>By Email and ECF</u>

The Honorable Peggy Kuo
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Howard Rubin
       <u>Criminal Docket No. 25-281 (BMC)</u>

Dear Judge Kuo:

    The government respectfully submits this letter to request that the Court deny the
defendant Howard Rubin's third bail application, because he has failed to overcome the
presumption of detention, and because he presents both a significant danger to the community
and risk of flight. Indeed, all that has changed since his last bail hearing is that the Second
Circuit has now resoundingly rejected Rubin's appeal of his civil trial conviction for sex
trafficking, involving several of the same victims as in the instant case. See <u>Moore v. Rubin</u>, --
F.4th --, 2025 WL 3248106 (2d Cir. Nov. 21, 2025).

I.  <u>Factual Background</u>

   A.  <u>The Trafficking Network</u>

    Between at least 2009 through 2019, Rubin, co-defendant Jennifer Powers and
others operated an extensive network whereby they recruited women to fly to New York to
engage in sex with Rubin in exchange for money, often relying on force, fraud and coercion.
The commercial sex acts involved bondage, discipline, dominance, submission and
sadomasochism ("BDSM").

Before 2011, the commercial sex acts primarily took place at luxury hotels in Manhattan. From 2011 to 2017, Rubin leased a penthouse apartment near Central Park (the "Penthouse") and, with Powers's assistance, transformed a bedroom into a sex dungeon (the "Dungeon"). The Dungeon was soundproofed; had a lock on the door; and was outfitted with BDSM instruments, devices and furniture, to which women could be strapped, suspended and restrained. Thereafter, the commercial sex acts often took place in the Dungeon, though Rubin also traveled to California, Florida, Nevada, Pennsylvania and the Bahamas to meet women for commercial sex.

Rubin relied on Powers and several other co-conspirators to recruit women for commercial sex. Rubin saw women for commercial sex multiple times a week, often day after day. See, e.g., Jul. 13, 2015, email from Rubin to Powers ("I might see someone EVERYDAY this week, (except thurs)."); Nov. 18, 2015, text messages between Powers and Jane Doe #1 (noting another woman was staying at the Penthouse the day before Jane Doe #1 was flying in to have commercial sex with Rubin, "so I need to coordinate carefully").[1] Rubin kept Powers apprised of who he was seeing, when, and often provided her with graphic details of the sex acts.

Powers was primarily responsible for the logistical aspects of the trafficking network, including arranging flights for the women to travel to New York; securing non-disclosure agreements ("NDAs") from the women; conferring with the Penthouse building doormen to ensure the women could access the Penthouse, and would not overlap with one another; paying the women after the commercial sex acts; and managing fallout with the women after their encounters with Rubin. Powers paid the women in amounts dictated by Rubin, using Rubin's money. When women endured the abuse to Rubin's satisfaction, they were typically paid $5,000; if they did not, they were typically paid several thousand dollars less or nothing.

Rubin and Powers kept a stash of blank NDAs in a safe in the Penthouse, which they required women to sign. Women were not provided with a copy of the NDAs before being required to sign. Women were required to attest that they were not under the influence of drugs or alcohol at the time of signing, when at times they had been provided with alcohol and/or drugs by Rubin or his co-conspirators before being presented the NDA. The NDAs purported to require, among other things, that the women assume the risk of injury for all BDSM encounters with Rubin, both historic and prospective; prohibited the disclosure of certain information about Rubin; and required the payment of $500,000 to Rubin as a penalty for breach. As discussed below, the NDAs grossly misrepresented the sexual activity to which they would be subjected.

The trafficking network often preyed on the vulnerable, including women who had previously been sexually abused, who lacked formal education, who were financially desperate and who suffered from addiction. For example, Rubin probed victims, including Jane Does #2 and #10, about prior abuse they suffered. Rubin created a family rape scene with Jane Does #8 and #9, assigning them the roles of "mommy" and "baby," and himself the role of

---

[1]    All errors and ellipses contained in quotes are original, unless otherwise indicated. In case citations, all citations and quotation marks are omitted and alterations adopted.

"daddy." Rubin learned that Jane Doe #4 had a sick child before he violently brutalized her body. Separately, Jane Doe #10 suffered from addiction, which Rubin and Powers acknowledged in text messages. In June 2014, before commercial sex with Rubin, Jane Doe #10 told Rubin she was "desperate," was in a "really tough" position, was sleeping on a couch and needed money "badly." She also indicated that she would take "plenty of Valium" to endure his abuse. Rubin agreed and recruited a co-conspirator ("Co-Conspirator-1") to assist in the abuse of Jane Doe #10. Rubin described Jane Doe #10 to Co-Conspirator-1 as hating "submissive but she's brokke and says she''11 do anything!" He reiterated, "She hates it, but she's soooo desperate!! We've got to make her cry!!!" Jane Doe #10 told Rubin she was "ready," and Rubin replied, "Ur not, bbut ur desperate and thts good."

Rubin and his co-conspirators relied on women being intoxicated with drugs and/or alcohol before the sexual encounters. For example, in September 2011, while at a restaurant before sexual activity, Rubin told another woman to give Jane Doe #10 drugs to, in sum and substance, take the edge off, and then in June 2014, before another encounter, he told Jane Doe #10 to "Get drunk!" after she had promised to take sufficient Valium to tolerate the activity. In January 2015, in an email to Rubin, Powers commented with surprise when she learned that Jane Doe #1 seemed to be able to tolerate Rubin's abuse without being on drugs. In 2015, Rubin provided Jane Doe #2 with a sedative so that he could enact a rape scene, which caused her to go in and out of consciousness while he sexually abused her. In October 2016, Jane Doe #5 was encouraged to use cocaine before she was solicited to engage in commercial sex. Rubin acknowledged in text messages to Powers that there had been a "[l]ittle bit of coke," and Powers replied that when she showed up to the Penthouse later that morning, there were "drugs all over the condo." In April 2016, a victim ("Victim 1") confided in Powers that she "took a weird pill last night with H and I am super messed up," which Powers confirmed was Vicodin. Powers then texted Rubin, "No one can drink for 6 hours straight…then take 2 vicodins, you were egging her on." Additionally, in September 2016, Powers texted Rubin that over the course of a week, multiple women had vomited from excessive alcohol consumption. And in May 2018, Rubin asked Jane Doe #6 if she did drugs before he abused her, indicating, in sum and substance, that now would be the time if she did.

The trafficking network relied on a recruitment system in which women were misled regarding the manner and degree of abuse they would endure. For one, the NDAs grossly misrepresented the sexual activity as "Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person." Additionally, both orally and in writing, Rubin and his co-conspirators significantly downplayed the manner and degree of violence the women would endure. Rubin knew that the activity would cause women significant pain and leave lasting bruising, and that on some occasions was so severe women required medical treatment. In an August 2013 email, Rubin acknowledged that the sexual activity would cause the women "a lot of pain," would make them cry, and would leave them "sore and bruised for probably a week." The abuse Rubin inflicted on victims—many of whom were gagged and restrained in the locked Dungeon during the encounters—included electrocuting their genitals; penetrating their genitals with pool cues and utensils; and beating their breasts and bodies with closed fists. At times, women were recruited on the basis they could use a "safe word" to make the abuse stop, but

3

during their sexual encounter, they were either unable to utter the safe word because they were gagged or, when they did say it, Rubin did not respect it. Other times, women said "no" or "stop," but Rubin persisted. Still other times, women lost consciousness, but Rubin continued to sexually abuse them.

For example, in 2011, Rubin solicited commercial sex with a victim ("Victim 2"), which he said would involve "spanking of ass, tits, pussy. Use of vibrators, dildos, bondage. Paddles and whips. Clamps for nipples + pussy. . . . I ALWAYS use a safe word and ALWAYS stop/pause if the girl has reached her limit." On that basis, Victim 2 agreed. When Victim 2 arrived at the Penthouse, Rubin instructed her to take pills he provided, and she complied. They caused her to go in and out of consciousness. Then, during the encounter, Rubin did not provide a safe word; hung her upside down for more than an hour; repeatedly punched her breasts and body with closed fists; and penetrated and sodomized, including while she was unconscious. Victim 2's injuries were photographed. Moreover, medical records—which were contemporaneously shared with Rubin—reflected that, as a result of the abuse, Victim 2 suffered "severe deformity of bilateral breasts," "rotational deformity of the right implant" and "scar tissue formation," which required surgical intervention, including a procedure to remove the scar tissue. The operation had to be delayed for several weeks until the "the swelling/edema and all bruising ha[d] resolved." Rubin settled with Victim 2 and paid for the surgery. Notwithstanding that encounter, Rubin persisted in his exploits, and by his own account, became "more intense."

In September 2015, Rubin inserted a pool cue into Jane Doe #1's vagina at the Penthouse. She told him to stop, but he continued, before dragging her to the Dungeon where she was gagged, restrained and further abused. A few months earlier, Rubin penetrated another victim ("Victim 3") with a pool cue in the same location in the Penthouse, while Victim 3 was restrained, as captured in a photograph. Jane Doe #1 and Victim 3 are not known to one another.

In September 2016, in anticipation of a BDSM sexual encounter between Rubin, Jane Doe #9 and Jane Doe #4, Rubin told Jane Doe #9, in reference to Jane Doe #4: "I want to hurt her." "I want to abuse her for hrs." "I don't care if she screams [laughing emoji][.]" "This is going to be so fun!" Then, Jane Doe #4 was told that there would be a safe word that she could use to make the conduct stop. However, Jane Doe #4 was tied and gagged, and could not say the safe word. Rubin and Jane Doe #9 brutalized Jane Doe #4's body, punching her breasts and head repeatedly. The abuse did not end until Jane Doe #4 was able to remove enough of the gag to bite Rubin's finger. Then, Rubin texted Powers:

| RUBIN: | It got very rough jenn, we need to be VERY VERY VERY nice…. |
| RUBIN: | Very important. Trust me. |
| RUBIN: | Very important |

Jane Doe #4's breast implant flipped from the abuse, and she sent a video to Powers showing some of the damage. Rubin and Powers agreed to pay Jane Doe #4 tens of thousands of dollars.

4

In October 2016, a female co-conspirator ("Co-Conspirator-2") provided Jane Doe #5 with cocaine and then proposed that Jane Doe #5 engage in a threesome with her and Rubin during which Jane Doe #5 would not have to have sex with Rubin. On that basis, Jane Doe #5 agreed. Then, Jane Doe #5 was brought to the Dungeon, locked inside, and physically restrained to the BDSM furniture, while she kicked, fought and screamed to be released. At one point, Co-Conspirator-2 had to sit on Jane Doe #5 to restrain Jane Doe #5. Notwithstanding Jane Doe #5's violent protest, Rubin sexually and physically abused Jane Doe #5 while she was restrained against her will.

In November 2018, Jane Doe #6 agreed to have commercial sex with Rubin based on his representation it would involve "light bondage" and that she could tell him to stop. Then, Rubin bound Jane Doe #6 to a chair in a hotel room in Las Vegas, Nevada, where he repeatedly beat her body and attempted to penetrate her with a large dildo. When she told him the rope was too tight, he slapped her in the face and told her to "shut up." She told him to stop hitting her breasts, but he persisted. She thought she was going to die. When the encounter was over, Rubin tried to convince Jane Doe #6 that rape was natural, referencing Disney movies like *Beauty and the Beast*. After Jane Doe #6's encounter with Rubin, she developed a seroma on her breast and could not work due to the bruising, which she told Rubin.

Additionally, Rubin continued to sexually abuse women even after they lost consciousness, including Jane Does #1, #2 and #7, and Victim 2.

B.   Obstruction of Justice & Witness Tampering

To protect the trafficking network, Rubin and Powers attempted to tamper with witnesses and obstruct justice, dissuading victims from turning to law enforcement or seeking legal recourse.

For one, the NDAs purported to require women to pay $500,000 to Rubin if they disclosed information about their sexual abuse. As the Second Circuit explained, "the NDAs indicate that Rubin used the penalty clause to intimidate women from speaking out, prevent them from taking legal action against him, or make them believe that to receive the agreed-upon payment they had no choice but to subject themselves to conduct beyond that to which they had consented." Moore, 2025 WL 3248106, at *15.

Rubin and Powers engaged in more explicit obstruction as well. For example, in connection with a fight between ████████ and ██████████████████ stemming from Rubin's abuse of ██████████, charges were filed against ██████████.[2] Powers instructed ████

---

[2]   The government respectfully requests leaves to file this letter under partial seal, to protect the identities of the victims referenced herein. █████████████████████████

████████████████████████████████████████████████████████████████████████████

█████ that Rubin would pay her legal fees, provided ████████ lie to the police about who leased the Penthouse, get rid of the drugs in the Penthouse, and keep Powers and Rubin's names out of the case (to which they were not parties). ████████████ complied and lied to the police. In a text message to Rubin, Powers stated with regard to ██████████ lawyer, "We probably need someone 'good' since the reason they fought was over you…I'm not sure if anything else would be brought up, drugs, sex, etcccc." Powers also sent ████████████ an email to share with ████████ lawyer, authorizing the lawyer to share all information with Rubin and Powers's own attorney (the "Lawyer"). The email Powers drafted read: "I am writing to express authorization for you to discuss my case with another attorney by the name of [Lawyer]. You have my express permission to share any and all information in regards to my case with [Lawyer]." Powers was adamant that ██████████ send the email, which Jane Doe #9 did.

In October 2016, Rubin suggested that Powers simply offer to pay off ████████ to drop the charges against ████████. For example, he wrote, "after things cool down next week, I'd like to offer [████████] 1k to drop the charges against [████████]. We don't need r names thrown around." In December 2016, he again suggested to Powers, "I wonder if we cann get hold of [██████████ and just pay herto drop charges. ?" Powers characterized the proposed payment as a "bribe."

In September 2017, the Lawyer was provided a copy of the draft complaint in what became a civil sex trafficking lawsuit against, among others, Rubin and Powers. See United States v. Howard Rubin et al., No. 17-CV-6404 (BMC) (E.D.N.Y.) (the "Civil Case"). The draft complaint detailed sex trafficking at the Penthouse. The same evening that the Lawyer received a copy of the complaint, Powers contacted 1-800-GOT-JUNK. The company was scheduled to clear out items from the Penthouse just days later, discarding evidence of Rubin and his co-conspirators' crimes.

In November 2017, the complaint in the Civil Case was filed. The plaintiffs included Jane Does #1, #4, #8, #9 and #10. Rubin advised Jane Doe #7, whom he saw for commercial sex between approximately 2014 to 2019, and who was not a plaintiff in the Civil Case, that pursuant to his arrangements, a hitman was contacted on the dark web to target women who had filed a civil suit against him. Specifically, as Jane Doe #7 reported to law enforcement:

> He once made comments to [Jane Doe #7] about hiring a hitman to target the women who had filed the civil suit. He had looked on the dark web and made contact with a hitman, but said that it was too much money. This seemed very real to [Jane Doe #7]. She did not think RUBIN was lying. He was getting off on talking about this. He said these women were stupid whores he met on Instagram. . . . [Jane Doe #7] was willing to testify to anything she told the Agents.



EDNY_0000001-9.  See also EDNY_0000010-15 ("RUBIN once implied to [Jane Doe #7] that he had asked POWERS to find a hitman for the women who sued him, but the guy wanted $850,000, and they thought that was too much.  He said the dollar amount wasn't worth it.  He also made comments about paying a girl to make her go away.").

Next, in January 2019, Rubin threatened Jane Doe #5 to attempt to dissuade her from pursuing litigation against him.  Specifically, in a letter (the "Threat Letter") he sent overnight to her parents' home, Rubin stated, in relevant part:

> I understand that you are considering suing me in connection with our S&M encounter we had together in October 2016.  Before you do so, I urge you to think about the following: . . .  I will testify publicly that you are a professional prostitute who agreed to have S&M sex with me for $5,000 and that you acknowledged that you understood the hazards of engaging in S&M behavior. . . . I plan to countersue the women currently involved and to seek Court imposed sanctions against the women and their attorneys.

Shortly thereafter, Rubin emailed Co-Conspirator-2, with whom he had abused Jane Doe #5, and reported: "I texted her and sent a fedex and a registered letter.  We think she lives with her mother in [redacted], but we don't know for sure," and attached a copy of the Threat Letter.[3]

Separately, Rubin advised Jane Doe #2 that he had hired private investigators to investigate women.  Numerous women—including several of whom were not plaintiffs in the Civil Case or any other litigation—reported that they suspected they were being followed and that their online accounts, including email and social media, had been hacked.  Indeed, between 2018 to 2025, Rubin paid at least two security firms directly, one as recently as April 2025— long after the Civil Case had ended, and at a time when, to the government's knowledge, there was no ongoing civil litigation involving Rubin and the trafficking network.

C.    Rubin's "Secondary Life"

During the relevant period, the defendant was married to Mary Henry ("Mary") and had several children, from whom he hid the trafficking network.   Rubin himself testified that he was living a "secondary life."  Moore v. Rubin, No. 17-CV-6404 (BMC) (E.D.N.Y.), Mar. 30, 2022, Tr. ("Rubin Testimony") at 1446-47.

Rubin and Powers spent more than $1 million of Rubin's money funding the operation.  "Rubin created a separate bank account, of which his wife was unaware, to pay for

---

[3]      Incredulously, Rubin's current lawyers blessed the Threat Letter sent directly to Jane Doe #5.  In violation of longstanding rules of professional conduct, Jane Doe #5's lawyers were not forewarned about the contact or Threat Letter, which itself constituted harassment and intimidation.

his encounters and Powers's salary." Moore, 2025 WL 3248106, at *3. Rubin also concealed from Mary that he had leased the Penthouse—a lease he maintained from 2011 to 2017.

Rubin lied to his family about his whereabouts, which involved near daily encounters with women for commercial sex. See, e.g., Nov. 18, 2014, emails between Rubin and Powers (discussing lies Rubin could tell Mary to explain his whereabouts); Dec. 19, 2014, email from Rubin to Powers ("By the time we go to the rockettes, dinner and dungeon, it will be 2am, - so its easier to tell mary im away rather than come in so late"); Jan. 12, 2015, email from Rubin to Powers ("[I'm] flying to SF for business tomorrow! In and out in one day! Im going to tell mary im away all week! . . . I still plan to see [Co-Conspirator-2] weds nite and big event on Thursday!"); Jan. 21, 2015, email from Rubin to Powers ("I probably see 5 girls the week of the 16th!!  Except the 16th is holiday and my anniversary!"); Aug. 2015 emails from Rubin to Powers (indicating that he would be sleeping at the Penthouse with different women and that he falsely told Mary he had stayed overnight at the Dream hotel).

He also flouted his obligations to his family to pursue commercial sex. Among other things, Rubin and Powers laughed about having had sex together in Rubin's marital bed. Another time, Rubin left his son home alone to pursue commercial sex. As he explained to Powers in an email, "[Woman-1] 'owes me' a quickie, so I think I might see her from 5-7pm . . . [Son's] home by himself, so I would really make it short.  Mary would murder me!"  See also Feb. 16, 2015, email from Rubin to Powers (discussing his plans for the week of his anniversary, including with "the two 21 yr old sluts" one day and with Jane Doe #1 the other, and his dilemma in having to be home with his son but wanting to see a different woman at the Penthouse later in the evening); Apr. 6, 2015, email from Rubin to Powers (noting that on April 8, he would be seeing "FREAKO" at the Penthouse "from 5-7, then meeting [son] and mary [at] Lincoln center for Lord of the Rings"); Jan. 29, 2016, text messages between Powers and Co-Conspirator-1 discussing Jane Doe #10 ("They went out after we finished[.]  H was supposed to be home around 9 bc Mary was flying in, but he didn't get home till after midnight."). He attended the Super Bowl with women with whom he had commercial sex, and he threw himself a days-long "60 shades of grey" party for his 60th birthday, for which he flew in many women whom he paid for commercial sex.

In short, Rubin hid from his family the criminal sexual activity that occupied much of his life for at least a decade, and for which he expended significant funds.

D.    Financing the Trafficking Network & Financial Crimes

Rubin was a successful financier who amassed a considerable fortune, much of which he moved offshore, and which he used to finance his trafficking network.

According to independently obtained reports of foreign bank and financial accounts ("FBARs") disclosed to the U.S. Department of Treasury, Financial Crimes Enforcement Network, since at least 2014, Rubin and his family have maintained accounts at Crown Global Insurance Group ("Crown Global") worth tens of millions of dollars. Specifically, Rubin maintains a life insurance policy (the "Rubin Policy"); Mary maintains a life

8

insurance policy (the "Mary Policy"); and the Mary J. Henry Living Trust maintains a policy (the "Trust Policy"), all held in the Cayman Islands. The maximum value of each of those accounts as of 2024, the most recent calendar year for which FBARs were filed, are as outlined below. According to Rubin, the cash value of those policies, in light of loans taken against the policies, as further outlined below. See ECF Nos. 51-5, 51-26.

|  | Max. Value as of 2024 | Cash Value as of 2025 |
|---|---|---|
| Rubin Policy | $74.4 million | $38.8 million |
| Mary Policy | $56.6 million | $53.8 million |
| Trust Policy | $20.2 million | $13 million |
| **Total:** | **$151.2 million** | **$105.6 million** |

Rubin has provided no indication of how those policies were funded or the source of those funds, nor do his independently obtained U.S. bank records reveal otherwise. According to Rubin, he and his brothers are trustees of the Trust Policy, of which his children are the beneficiaries.

Since 2014, Rubin received approximately $63.5 million in disbursements from Crown Global, and according to independently obtained bank records for his U.S. accounts, only transferred approximately $220,000 to Crown Global in the same period. Rubin received the disbursements from three different Crown Global accounts: the Rubin Policy, the Trust Policy, and a third account in his brother's name (which has since been closed). Those disbursements were deposited into Rubin's U.S. bank accounts, which accounts were used to finance Rubin's trafficking network. Among other things, those U.S. accounts were used to pay the lease on the Penthouse; to pay for commercial sex, including to send wire transfers to Jane Does #1, #2 and #7; and to pay Powers millions of dollars, including to purchase a home in Texas.

Indeed, since approximately 2012, Rubin has funded virtually all aspects of Powers and her family's lifestyle. Among other things, he has paid for the rent on their Manhattan apartment; her children's private school tuition; the downpayment and mortgage on their Texas-based home after the Powers moved to Texas in 2020; her legal fees in connection with the Civil Case; and since 2018, he has directly paid her credit card bill.

Notably, after the filing of the Civil Case, the structure of Rubin and Powers's financial relationship fundamentally changed, but the substance did not. Instead of wiring Powers money to her bank accounts, Rubin began funding her lifestyle directly, largely by making mortgage payments and paying off her and her husband's credit card bill. Between at least 2014 to the present, neither Rubin nor Powers have disclosed any of the money Rubin has provided to Powers and her family to the Internal Revenue Service ("IRS"), which they had an obligation to do. Between 2018 to 2023, those payments exceeded $9 million.

Moreover, Rubin and Powers have lied to financial institutions to conceal the nature of their relationship. For example, to secure the mortgage on her home in Texas, which Rubin co-signed, Powers falsely told a bank ("Bank") that Rubin was her "uncle." Then, Rubin attested to a financial statement in June 2020, claiming he was not a party to litigation. In fact, Rubin and Powers were parties to the Civil Case, for which a trial date had been set; had been deposed in the Civil Case; and he had sat for the depositions of all plaintiffs that had been deposed. Then, in April 2022, three days after he had testified in the jury trial in the Civil Case, he attested to a second financial statement further perpetuating the lie that he was not party to litigation.

II.    Procedural History

As discussed, in November 2017, Rubin and Powers were sued in the Civil Case for civil sex trafficking, among other causes of action, in a case that proceeded to trial in March and April 2022. A jury found Rubin liable and Powers not liable. Rubin appealed to the Second Circuit on numerous grounds, including sufficiency of the evidence. On November 21, 2025, his arguments were flatly rejected. The Circuit found, among other things:

> The record is replete with evidence that Rubin developed a sophisticated operation to solicit and recruit various women, inform them that some degree of sadomasochism would take place, provide them a combination of alcohol and drugs like Vicodin and oxycodone, and then grossly exceed the parameters of the activity he told them to expect. He would then pay the women for the encounter after he finished. The evidence established that he had a *modus operandi*. Many plaintiffs testified that, although they were aware they would engage in some form of rough sex, they were not aware that Rubin would insert pool cues into them, deploy electrical devices, or escalate encounters after they were rendered incapable of objecting because he had bound and gagged them. And on many occasions, even when they were able to protest and plead for him to stop, Rubin continued to rape or abuse them. Accordingly, the jury could have reasonably found Rubin liable under the TVPA for recruiting, soliciting, transporting, and patronizing women while knowing or recklessly disregarding the fact that he would subject them to violent abuse to which they had not consented.

Moore, 2025 WL 3248106, at *14. The Circuit emphasized Rubin's practice of "actively recruit[ing] women who were uneducated, financially dependent, and victims of childhood abuse," and subjecting them to "significant psychological and physical abuse." Id. at *16.

On September 17, 2025, a grand jury returned a ten-count indictment charging Rubin and Powers with sex trafficking, in violation of 18 U.S.C. §1591(a), transporting women in interstate commerce for prostitution, in violation of 18 U.S.C. § 2421(a), and, as to Rubin, bank fraud, in violation of 18 U.S.C. § 1344. They face a mandatory minimum sentence of 15

10

years' imprisonment and a maximum sentence of life for sex trafficking; and a maximum sentence of 10 years imprisonment on each count of transporting women in interstate commerce for prostitution.  Rubin faces a maximum term of 30 years' imprisonment for bank fraud.

On September 26, 2025, Rubin was arrested at his rental home in Connecticut.  At the time of his arrest, he refused to open the door until law enforcement began forcibly entering, and he refused to tell law enforcement where his passport was located.  Indeed, at no time between Rubin's arrest and Pretrial Services interview did he provide its location to law enforcement.  Moreover, inside the rental home, law enforcement recovered seven cellphones, four of which were iPhones.[4]  Notably, two of the cellphones were iPhone 16 Pros in their cases, inside Ziploc bags.  One of the iPhone 16 Pros was hidden inside a bag with a folding tent, as photographed below to the left.  (In a recent jail call, Rubin admitted that he purchased the new iPhone 16 Pros in the past year, after hearing rumors of the government's investigation.)  Rubin also secreted stacks of cash in a second bag, some of which is visible in the photograph below to the right, primarily in denominations of $50 and $100 bills.

 

Later that day, Rubin was arraigned before the Honorable Peggy Kuo and ordered detained pending trial, as discussed further below.  ECF No. 11.  Rubin has been detained at the Metropolitan Detention Center ("MDC") since that time.

On September 30, 2025, a grand jury returned a Superseding Indictment against Rubin, Powers and Stephen Powers, which added six charges of subscribing to false tax returns as to Powers and Stephen Powers, but otherwise remained the same as to Rubin.  ECF No. 21.

On October 20, 2025, Rubin was arraigned before the Honorable James R. Cho, who rejected Rubin's second bail application, as discussed further below.  ECF No. 44.

---

[4]    The government initially believed Rubin had eight cellphones, however, one is in fact a 7th generation iPod Touch, with many of the same built-in applications as an iPhone, including the applications FaceTime and Messages, and it contains email and web history data.

III.    Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In evaluating dangerousness, the Act considers the risk that the defendant will "obstruct justice, or threaten, injure, or intimidate . . . a prospective witness or juror," or attempt to do the same. 18 U.S.C. § 3142(f)(2)(B). Moreover, as to dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "the danger that the defendant might engage in criminal activity to the detriment of the community." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993).

A rebuttable presumption of dangerousness and risk of flight arises when a defendant is charged with a violation of 18 U.S.C. § 1591, as here. 18 U.S.C. § 3142(e)(3)(D). The presumption means that the court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(3). To rebut this presumption, the defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this limited burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of evidence that the defendant presents a risk of flight. Id.

To determine whether conditions of release can reasonably assure the defendant's appearance and the safety of the community, the Court must consider: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse, and past conduct; and (4) the nature and seriousness of the danger to the community or to an individual that would be posed by release. See 18 U.S.C. § 3142(g). If a defendant meets his burden of production as to dangerousness and flight, the presumption in favor of detention does not disappear but remains a factor for the court to consider. Mercedes, 254 F.3d at 436; United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986) ("Were the presumption . . . to vanish upon any showing . . . , courts would be giving too little deference to Congress' findings regarding this class [of defendants].").

Under 18 U.S.C. § 3142(f), a bail hearing

may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

12

During detention hearings, the government may proceed by proffer and the rules of evidence do not apply.  See United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004) ("[F]ew detention hearings involve live testimony or cross examination. . . . . [C]ourts often base detention decisions on hearsay evidence."); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) ("It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts."); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); see also 18 U.S.C. § 3142(f) (evidentiary rules do not apply).

IV.     The Bail Applications

During two extensive detention hearings, two magistrate judges rejected arguments and packages similar to those being presented now and found that Rubin should be detained pending trial, as both a danger to the community and flight risk.

A.     The First Bail Hearing

On September 26, 2025, Rubin was arraigned before Judge Kuo, and requested bail on a $25 million bond, secured by an $8 million apartment that Rubin co-owned with Mary and in which she lived, in addition to the surrender of his passport and travel restrictions. Additionally, as reflected in the Pretrial Services Report, Mary was willing to co-sign the bond.

Pretrial Services recommended detention, finding no condition or combination of conditions that could reasonably assure Rubin's appearance or the safety of the community.

The government opposed bail on the same basis.  As to danger, the government emphasized the brutal nature of the charged conduct, the extensiveness of the trafficking network, and that the defendant was incorrigible.  Sep. 26, 2025, Tr. at 5-7 (enclosed as Exhibit A).  Moreover, the government identified five examples of Rubin and his co-conspirators engaging in obstruction and witness tampering.  See ECF No. 6 at 5-6, 18-19.  As to flight, at the time of Rubin's arrest, he refused to tell law enforcement where his passport was; was in possession of numerous cellphones; had significant assets in the Cayman Islands; was unemployed; was living alone; and was not suffering from an acute medical condition (to the contrary, he was deemed fit for confinement), removing impediments to flight.  Ex. A at 7-9, 23. Finally, the government emphasized the strength of the evidence and the severe penalties Rubin faced, which first became a reality for Rubin on the day of his arrest.  Id. at 8-9, 21-22.

By contrast, Rubin argued he was not a danger because he was a 70-year-old man with no criminal history; the "principal conduct[] took place in the years before 2019"; he is alleged to have "mistreated women who were known to him," not "strangers"; and there was "insufficient evidence of any threat to any witness."  Id. at 14-15, 25.  As to witness intimidation, he claimed all the plaintiffs in the Civil Case were able to testify, thus they were not intimidated; it was proper to hire private investigators; offers of "payoffs to settle cases are absolutely appropriate"; the letter to Jane Doe #5 did not threaten "violence or harm"; and there was no concrete evidence he in fact searched the dark web for a hitman.  Id. at 17-18, 20-21.  He further argued he was not a flight risk because he maintained a close relationship with his family and

lacked ties overseas; had not made attempts to flee to date; was willing to surrender his passport; and was "under the care of doctors" and taking medication. Id. at 11-6. As to the strength of the evidence, Rubin noted that he was appealing his Civil Case conviction. Id. at 15.

After thoroughly considering the arguments and proposed package, Judge Kuo found Rubin had not overcome the presumption of detention, that he presented both a danger to the community and a risk of flight, and "that there are no conditions or set of conditions that will ensure Mr. Rubin's appearance in court or the safety of the community." Id. at 25-28.

The court noted the "very serious set of criminal allegations against Mr. Rubin that spanned several years," with "multiple victims" and "very volent behavior," for which he faced "very serious criminal penalties should he be found guilty on one of these, let alone on multiple counts." Id. at 25. Further, "[t]he evidence as set forth does appear to be strong," which included the factual record from the Civil Case. Id. at 25-26. Additionally, "the multiplicity of the threats and attempts to obstruct justice show me that Mr. Rubin continues to be, or poses a threat to the community that cannot be addressed by any bond condition." Id. at 26. Rubin had directly contacted witnesses in the context of litigation, id. at 21, and there was an allegation he made efforts to find a hitman "from a specific witness" with "specific information as to the use of the dark web. So it does not appear to be speculation," id. at 26. As to Rubin's claim that witnesses were not in fact intimidated, the court found, "the fact that the witness came to court and testified anyway speaks more to their strength and their courage than to any attempts to intimidate them." Id. at 17.

The court was also "very concerned about the risk of flight," including Rubin's refusal "to turn over his passport or at least tell them where it was," and expressed skepticism that Rubin did not know where his passport was located. Id. at 27. Rubin's possession of "several cellphones in boxes" demonstrated Rubin's "state of mind . . . which is that he is planning or trying to evade something." Id. at 27. As to Rubin's assets in the Cayman Islands, "whether it's $75 million or $35 million, [it] is a lot of money offshore and so it does show that he has an ability to access money that could enable him to flee and go someplace else and evade the authorities." Id. Finally, the court dismissed any suggestion that Rubin's prior awareness of an investigation was somehow an indication he would not flee. "[B]eing arrested really focuses a person's mind and makes it real." Id. The court thus entered a permanent order of detention.

B.    The Second Bail Hearing

On October 16, 2025, Rubin filed a second application, requesting bail on a $50 million bond signed by him, Mary and his daughter; security of $8.6 million in cash and property provided by him, Mary and his brother; installment of a third-party trustee to oversee and restrict disbursement of funds from the Rubin Policy; his resignation as a trustee on the Trust Policy; electronically monitored home detention; installation of security cameras at his home; surrender of his passport; and no contact with co-defendants, witnesses or Jane Does. ECF No. 40 at 1-2. He also expressed a willingness to "hire a private security service at his expense to maintain 24/7 surveillance." Id. at 2 n.5. On October 20, 2025, Judge Cho denied the application, again finding Rubin to be both a danger and risk of flight. ECF No. 44.

14

Rubin repeated virtually all the arguments he presented to Judge Kuo, see, e.g., Oct. 20, 2025, Tr. at 4-6, 8, 10-11 (enclosed as Exhibit B), however, this time he attempted to support his claims of significant family ties with affidavits from family, friends and acquaintances, in addition to photographs of him playing with his grandchildren, see ECF Nos. 40-1 to 40-13. He claimed "[h]e has always placed [his family] at the center of his life." Ex. B at 8. He also furnished medical records, dated July 2025, showing that he had a stroke, but was discharged to "Home or Self Care," had no dietary restrictions, could engage in activity as tolerated, and his treatment involved taking two new medications. ECF No. 40-14. Other affidavits discussed Rubin's vigor. See ECF No. 40-7 ("The energy he has with three small children is remarkable for a seventy year old grandfather."). He dismissed the fact that he kept seven cellphones by claiming that they were "old devices" that (a) counsel asked him to keep for evidence, Ex. B at 9, and/or (b) his grandchildren played with, ECF No. 40 at 8. Finally, he claimed that the dollar amount of the bond package was "very substantial." Ex. B at 4, 6, 29.

In opposition, the government maintained that there were no conditions of release that could reasonably assure the safety of the community or Rubin's appearance. ECF No. 42. Among other things, history has proven that Rubin's family are no deterrence to his criminal conduct. Ex. B at 17. Moreover, his claim that his cellphones were simply old devices was false, as two were new iPhone 16 Pros in their boxes. Id. at 16. There was also no basis to conclude that the bail package was "very substantial" as to Rubin and his family. Id. at 14. He had not provided supporting records, and he had already lied to the IRS, his accountant, and the government about his finances. Id. at 14-15, 26. And the bail package would leave Rubin's family with millions in the Cayman Islands, which could easily facilitate his flight. Id. at 15.

Judge Cho rejected the application, finding, among other things, "$50 million sounds like a lot of money to a layperson but it may not be for this defendant and his family." Id. at 33. Moreover, the court rejected the argument that the proposed suretors "will hold moral suasion over this defendant and assure this Court that he will appear in court as directed and not be a danger to the community or involve himself in witness intimidations," given that he had previously led a "double life" of which his family was wholly unaware. Id.

C.    The Instant Application

On December 9, 2025, Rubin filed his third bail application, identical to that presented to Judge Cho, except for an increase in the bond amount and secured amount, and an agreement that his brothers will also resign as trustees of the Trust Policy. ECF No. 51. Specifically, Rubin seeks bail on the following conditions:

- $70 million bond, signed by him, Mary and his daughter (as opposed to the $50 million previously offered);

- Posted security valued at $37.6 million (as opposed to the $8.6 million previously offered), comprised of: $35 million cash from the defendant; a $1.6 million home owned by Mary; and a $1 million home owned by the defendant's brother;

15

- Resignation of the current trustees from the Rubin Policy and Trust Policy;

- Installment of third-party trustee Daniel Strachman to oversee and restrict disbursement of funds from the Rubin Policy and Trust Policy to "regular living expenses" and "family expenses";

- Electronically monitored home detention;

- Installation of home security cameras;

- "24/7 armed security guard" at Rubin's expense;

- Surrender of his passport; and

- No contact with his co-defendants, or "known witnesses or Jane Does."

Id. at 3, 5-6.  For the reasons discussed below, Rubin's bail application should be denied.

V.    Rubin Should be Detained Pending Trial Because He is Both a Danger and a Flight Risk

Each of the four factors outlined in the Bail Reform Act weighs strongly in favor of Rubin's detention, as does the presumption of detention applicable here.  See 18 U.S.C. § 3142(e)(3)(D).  Rubin's arguments—largely recycled from the previous two bail hearings—fail to overcome the presumption and his package fails to mitigate the significant risks that he poses to the community and of flight.

A.    The Nature and Circumstances of the Crime Are of the Utmost Seriousness

The charged offenses were depraved, horrifically violent and evidence Rubin's total disregard for the humanity of others, all of which demonstrates that he is a danger to the community and must be detained pending trial.

Rubin and his co-conspirators transported women to New York with lies about the nature of the sexual activity they would endure, then Rubin brutalized the women in his Dungeon, often with the help of a co-conspirator.   Rubin received sexual gratification from inflicting physical and psychological pain on women, often in total disregard for their lack of consent.  Many times, the women were powerless to make the abuse stop—because they said a safe word or told Rubin to stop, which he disregarded; because they were gagged and thus unable to coherently speak; or because they lost consciousness, while Rubin nonetheless continued to abuse them.  Rubin subjected his victims to closed-fist beatings of their breasts, heads and bodies; penetration by foreign objects, like utensils and pool cues; and electrocution, among other things.  Rubin left his victims' bodies bruised and at times so deformed that they required corrective surgery, of which Rubin was aware.  Then, Rubin and his co-conspirators used financial and legal coercion to silence the women, including through NDOs that purported to require the women to pay him half a million dollars in damages for speaking out, and further

16

threatening legal recourse and public shaming if they did. Rubin hired private investigators and told Jane Doe #7 that he had pursued a hitman to target women who had sued him.

The sex crimes spanned a decade. During that period, Rubin committed sex crimes multiple times a week, often day after day. The victims were plentiful. Many were targeted because of their vulnerability—including histories of abuse, lack of formal education, desperate financial need and addiction. Rubin pried into victims' past sexual abuse, acted out familial rape scenes, and mocked a victim's addiction and financial desperation.

During the relevant period, Rubin acted with impunity. He was undeterred after his trafficking of Victim 2 in 2011 caused such sustained damage to her breasts she required surgery to remove the scar tissue that had formed, and could not be operated on for weeks until the swelling had resolved. To the contrary, he claimed to have become more violent, and indeed caused a similar injury to Jane Doe #4, wherein her implant flipped. He was undeterred after the police arrived at the Penthouse after he sexually abused ███████████, and he was even undeterred after the filing of the Civil Case in November 2017. Instead, he trafficked Jane Doe #6 in Las Vegas in 2018, and he continued to engage in criminal sex acts with Jane Doe #7 through 2019, which included traveling with her to Las Vegas and the Bahamas in 2019.

Rubin also engaged in brazen financial crimes. In 2020 and 2022, in support of his application to co-sign the mortgage on Powers's Texas home, Rubin lied to the Bank about his involvement in the Civil Case, notwithstanding that at the time of his 2020 disclosure, a trial date had been set, and at the time of his 2022 disclosure, he himself had testified in that trial. Moreover, to date Rubin has failed to disclose to the IRS more than $9 million he has paid to Powers between 2018 to 2023, as he was required to do.

In short, Rubin's crimes were sustained and inherently dangerous, demonstrating that detention is necessary to protect the community.

B.    The Weight of the Evidence is Overwhelming

The weight of the evidence is overwhelming, further underscoring Rubin's dangerousness, and providing him with a powerful incentive to flee.

As an initial matter, both Rubin and Powers admitted to transporting women interstate for prostitution during their depositions and trial testimony in the Civil Case. See, e.g., Rubin Testimony at 1435, 1438-39 (indicating he always paid for BDSM sex and noting that "most of the women that I was with were flying in from, you know, somewhere" outside of New York); Powers Deposition at 195 ("I knew that that's what girls were coming for, for sex. And I knew that that was the amount that was agreed upon, was $5,000."). Text messages, emails, photographs, financial records, flight records and other evidence confirm as much. Accordingly, Rubin's guilt is all but certain on Counts Three through Nine, charging violations of transporting women interstate for prostitution. The defendant faces a maximum sentence of 10 years'

imprisonment on each of those seven counts.  And the government estimates the U.S. Sentencing Guidelines ("Guidelines") range on those counts to be life imprisonment.[5]

There is likewise overwhelming evidence of Rubin's guilt of Count Ten, charging bank fraud, for his lies to the Bank, for which he faces a maximum term of 30 years' imprisonment.

Finally, there is overwhelming evidence of Rubin's guilt of sex trafficking, for which he faces a minimum term of imprisonment of 15 years, a maximum sentence of life, and, per the government's calculation, a Guidelines sentence of life.

Rubin and his co-conspirators lured victims to the Dungeon with lies about the manner and degree of the abuse the women would endure.  The NDAs women were required to sign falsely represented that the activity "may on occasion cause injury to my person," when Rubin knew injury was certain.  Other times, Rubin described the activity as involving "light fetish play," or promised to respect a safe word, but then disregarded women's use of the safe word or pleas to stop.  Rubin plotted the pain he would inflict on victims in text messages with co-conspirators, and thereafter recounted the events to Powers in emails and text messages. During these encounters, Rubin electrocuted women's genitals; probed their vaginas with pool cues and utensils; senselessly beat their bodies and heads; and continued to sexually abuse them even when they lost consciousness.  Rubin saw photographic evidence of the abuse victims suffered and was aware that some even required medical attention, yet his conduct continued.

The victims' accounts are corroborated by text messages, emails, photographs, videos, medical records, financial records, flight records and other evidence.  Moreover, the victims' accounts corroborate one another, demonstrating Rubin and his co-conspirators' *modus operandi*.  See United States v. Maxwell, 510 F. Supp. 3d 165, 172 (S.D.N.Y. 2020) (Nathan, D.J.) (ordering detention based on, inter alia, the strength of the government's case—namely three witnesses' "detailed and corroborating accounts" of the defendant's crimes, and "additional evidence, including flight records").

---

[5]     While U.S.S.G. § 2G1.1 typically applies to transporting women interstate for prostitution, a cross-reference to § 2A3.1 applies where the conduct involved engaging in a sex act with another through, among other things, "force against the victim," "rendering the victim unconscious," "threatening or placing the victim in fear," or engaging in a sex act with a victim "who is incapable of appraising the nature of the conduct or who is physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act. " § 2G1.1 cmt. n.4.  The Civil Case alone establishes the applicability of the cross-reference, which yields a higher Guidelines range.  See United States v. Watts, 519 U.S. 148, 156-57 (1997) (factual disputes at sentencing must be proved by preponderance).  Even without the cross-reference, the government estimates the Gudelines range to be 87 to 108 months' imprisonment on those counts, a significant term for a 70-year-old man.

In the Civil Case, Rubin was found liable for civil sex trafficking involving conduct similar to that here, and some of the same victims. On November 21, 2025, the Second Circuit rejected Rubin's appeal of that conviction, finding instead that the record was "replete with evidence that Rubin developed a sophisticated operation" to traffic women, had a *modus operandi* that involved plying women with alcohol and drugs, lying to them about what the sex acts would entail, and then "grossly exceed[ing] the parameters of the activity he told them to expect." Moore, 2025 WL 3248106, at *14.

The weight of the evidence creates a strong incentive to flee, particularly where Rubin is faced with a mandatory minimum sentence of 15 years imprisonment, a maximum sentence of life, and a Guidelines sentence of life. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (finding maximum sentence of 15 years "sufficient to provide him with a strong incentive to flee").

Because Rubin now faces the significant likelihood that he will spend the rest of his life in prison if he remains in the United States to face these charges, he has a powerful incentive to flee, which in these circumstances no bail package can mitigate.

C.    The Nature and Seriousness of the Danger Posed is Significant

There is also a serious risk that Rubin will continue to engage in sexual violence, "obstruct justice," "threaten, injure, or intimidate" prospective witnesses, and attempt to do the same if he were released. 18 U.S.C. §1342(f)(2)(B).

This is not a case in which the charged conduct was aberrational or short lived. Rubin engaged in commercial sex acts on a near-daily basis for ten years. He relished in the physical abuse of women at his own hands. He persisted in abusing their bodies after they begged him to stop and after they were rendered unconscious. And he was undeterred by the filing of the Civil Case in 2017, going on to traffic Jane Doe #6 in Nevada in 2018, and continuing to engage in criminal sex acts with Jane Doe #7 until 2019, including traveling with her to Nevada and the Bahamas in 2019. Rubin has given this Court no reason to believe that he has reformed. To the contrary, his history of brutalizing women, including ten Jane Does, demonstrates that he continues to present a danger to the community. See United States Alexander, No. 24-CR-676 (VEC) (S.D.N.Y.), Dkt. No. 37 at 120 (finding Alexander brother continued to present danger to women notwithstanding that "the government has proffered no evidence of misconduct after 2021," where the "sexual misconduct has continued for years" and there was no evidence "they have changed their stripes"); United States v. Combs, 2024 WL 4903741, at *3 (S.D.N.Y. Nov. 27, 2024) (finding no conditions of release would assure safety of community where defendant was charged with, inter alia, sex trafficking between 2009 to 2018 and had a "propensity for violence"); United States v. Epstein, 425 F. Supp. 3d 306, 314-20 (S.D.N.Y. 2019) (detaining defendant who trafficked dozens of minor victims on danger and

flight grounds 14 years after charged conduct ended, because <u>inter alia</u>, he appeared unlikely to be able to abstain from criminal sex).  That the last charged sex act occurred in 2019 is of little mitigating value, where there is compelling evidence that Rubin is a serial sexual predator.

Moreover, numerous examples demonstrate that Rubin's instinct when faced with victims willing to come forward is to meet them with financial and legal coercion, and obstruction and intimidation.  <u>See</u> <u>LaFontaine</u>, 794 F.2d at 134 (underscoring that even "a single incident of witness tampering constitutes a threat to the integrity of the trial process" and can justify detention).



For example, in ▮▮▮▮▮▮▮▮, when police showed up to the Penthouse after ▮▮▮ ▮▮▮▮ and ▮▮▮▮▮▮ fought, Powers instructed ▮▮▮▮▮▮ to lie to the police about who owned the Penthouse, to keep her and Rubin's names out of any report, and to get rid of drugs in the Penthouse, in exchange for Rubin funding ▮▮▮▮▮'s legal fees.  Rubin and Powers texted about the need to get a strong lawyer, given Rubin's potential exposure.  Moreover, Powers attempted to control ▮▮▮▮▮▮▮'s legal relationship, directing ▮▮▮▮▮▮ to consent to sharing all information about ▮▮▮▮▮'s case with Rubin and Powers's own lawyer.

Second, in October and December 2016, Rubin repeatedly referenced wanting to bribe ▮▮▮▮▮ to make her drop the charges against ▮▮▮▮▮, because he recognized that the case, to which he was not a party, could expose him and the trafficking networking.

Third, in September 2017, the same evening Rubin and Powers's lawyer received a draft of the Civil Complaint—alleging that Rubin trafficked the plaintiffs in the Penthouse Dungeon—Powers contacted a junk removal company, who were then scheduled to clear out items from the Penthouse days later, thereby destroying relevant evidence.  Given that Rubin rented and paid for the Penthouse, as well as the belongings therein, it is inconceivable that Powers would have done so without Rubin's knowledge and blessing.

Fourth, Rubin advised Jane Doe #7 that he had arranged to find a hitman on the dark web to target victims bringing legal action against him, which felt very real to Jane Doe #7.  The foregoing demonstrates Rubin's willingness to explore violent methods to silence women who would otherwise expose him, and his ability to further conceal his criminality through means such as access to the dark web.  Even assuming that Rubin was boasting—of which there is no indication—the message to Jane Doe #7, who was not yet party to litigation, was clear and received: Rubin would target women who spoke out against him using the most violent means.

Fifth, in January 2019, Rubin sent the Threat Letter to Jane Doe #5's parents' house, by FedEx and registered mail, and attempted to contact her by text.  Believing (correctly) that she was on the precipice of litigation, he threatened to publicly shame her as a "professional prostitute" and pursue sanctions should she persist.  <u>See</u> <u>LaFontaine</u>, 210 F.3d at 135 (affirming detention for dangerousness where defendant engaged in witness tampering that did not involve threats of violence, because "the harm to the integrity of the trial is the same no matter which form the tampering takes").  Neither Rubin nor his counsel attempted to contact Jane Doe #5's lawyer, or forewarn them of the contact, as the professional rules of conduct required.

Sixth, Rubin hired private investigators to investigate women. Women who were not party to any litigation reported believing they were being followed and having their online accounts hacked. Rubin has continued to pay private investigators through at least April 2025.

That the government is presently unaware of tampering efforts after 2019 is unsurprising given the history of this case. Beyond the fact that tampering is incredibly difficult to detect, particularly where defendants use sophisticated means, including encrypted applications, the dark web, and co-conspirators to obscure their conduct—as Rubin appears to have done here—the government is aware of no new litigation involving Rubin and the trafficking network since 2019. Now, however, Rubin is receiving discovery in the instant case, and will receive 18 U.S.C. § 3500 material, revealing the dozens of victims and witnesses whom the government has interviewed, many of whom were not party to any prior litigation. Now, facing criminal charges and the very real prospect of life imprisonment, coupled with the roadmap offered by the government's productions, Rubin will be more incentivized than ever to attempt to obstruct the investigation and tamper with witnesses, creating a significant danger.

Thus, there is clear and convincing evidence that Rubin will continue his sexual violence, as well as "obstruct justice, or threaten, injure, or intimidate . . . a prospective witness," or attempt to do the same if released, see 18 U.S.C. § 3142(f)(2)(B), which Judge Kuo found "cannot be addressed by any bond conditions," Ex. A at 26. See Millan, 4 F.3d at 1048 (rejecting argument that "only threats to particular, specified witnesses provide a basis for detention" and finding detention appropriate given prior credible threats to witnesses generally).

D.    Rubin's History & Characteristics Demonstrate He Will Not Abide by Any Conditions of Release

Rubin's history and characteristics demonstrate that he cannot be trusted to abide by any conditions of release, particularly in light of his dishonesty, exorbitant wealth, and lack of meaningful community ties.

As discussed above, Rubin's brutality and dishonesty are at the center of this case. His disregard for the suffering of others, and singular focus on his own satisfaction, underscore that he cannot be trusted to comply with court-imposed conditions.

Rubin's dishonesty was not constrained to his lies to his victims. For example, in connection with the Civil Case, he was deposed under oath and falsely claimed that other than providing Victim 1 with "Vicodin twice," he did not "provide any drugs, narcotics, or controlled substances of any kind to any other women in the penthouse," and never did "drugs with any of the women in the apartment." Rubin Deposition at 188. Of course, Rubin and his co-conspirators regularly furnished drugs to his victims, including Jane Does #2, #5 and #10, and Victim 1 and Victim 2. See Moore, 2025 WL 3248106, at *14 (affirming conviction and noting Rubin's *modus operandi* of providing victims with "a combination of alcohol and drugs like Vicodin and oxycodone"). Similarly, at the time of his arraignment in the instant case, Rubin falsely told Pretrial Services that he only did "cocaine once about ten years ago, ecstasy twice between ten and twenty years ago, and marijuana once while in college," see Pretrial Services

Report, in direct contradiction to emails, text messages and witness accounts regarding his recreational drug use.

Rubin also lied to Pretrial Services about his finances.  He reported the bulk of his wealth comprising a $35 million life insurance policy, which his lawyers represented to Judge Kuo was the Rubin Policy.  See Pretrial Services Report; Ex. A at 12-13.  Thereafter, in discussing Rubin's second bail application, his counsel represented to the government that the Rubin Policy was the only foreign policy to which he had access.  See ECF No. 42 at 16.  The government then advised counsel that it saw Rubin withdrawing funds from multiple Crown Global accounts.  Only then did counsel reveal that Rubin was in fact was a trustee on the Trust Policy.  Id.  That omission was egregious—independently obtained bank records demonstrate that Rubin received more than $7 million from the Trust Policy into his U.S. bank accounts in just the last two years.  Yet, he failed to disclose his access to that policy to both the government and Pretrial Services.

Rubin also lied to his accountant (the "Accountant"), whose affidavits he has exhibited to his second and third bail applications.  See ECF Nos. 40-15, 50-37.  The Accountant prepared both Rubin and Powers's tax returns during the relevant period, and at no time was informed that Rubin had been funneling millions of dollars to Powers and her family, including more than $9 million between 2018 to 2023.  Finally, and as discussed above, Rubin lied to the Bank in connection with Powers's home mortgage and continues to lie to the IRS.   Given the ease with which Rubin lies, the Court should have no confidence that he will abide by court-imposed conditions of release.  See United States v. Nouri, 2009 WL 2924334, at *2 (S.D.N.Y. Sep. 8, 2009) (Chin, D.J.) (finding defendant presented "substantial risk of flight" based, in part, on "dishonest and obstructive conduct," including "commit[ing] fraud").

Beyond Rubin's violence and dishonesty, Rubin and his family have exorbitant wealth, most of which is held in accounts overseas.  Further, Rubin lacks meaningful community ties.  He has been separated from his wife since at least 2021; since 2022, he has been living alone in a rental home in Connecticut; and he has been unemployed for years.  His claims to be a devoted family man are flatly belied by the record, which instead show that for at least a decade, Rubin lied to and flouted obligations to his family in favor of pursuing sexual violence against victims.  Thus, there is little tethering him to the United States, particularly when faced with the very real prospect of life imprisonment.  See United States v. Sabhnani, 493 F.3d 63, 76-77 (2d Cir. 2007) (finding defendant's assets, "in the millions of dollars," provided ample means to finance flight for themselves and their family, and that "[a] defendant facing a significant term of incarceration might well prefer to lose his financial assets rather than his freedom").

Rubin's actions at the time of his arrest demonstrate his intent to flee.  Rubin had secreted wads of $50 and $100 bills in a bag.  He refused to tell law enforcement where his passport was located.  He possessed seven cellphones, two of which were new iPhone 16 Pros, in their cases, in Ziploc bags.  One was hidden in a bag with a folding tent.  During an October 29, 2025, recorded call from the MDC, Rubin admitted to Mary that he had purchased the new iPhones after "we heard rumors of this, you know, a government thing in like, yeah. December, January."  During the call, Rubin incredulously claimed that he bought not one but two new

iPhones so that he would have them available to him if he were arrested and his phone was seized. Nonetheless, Rubin's admissions on the call concerning when and why he purchased the phones underscores the falsity of his claims in support of bail application that he "did not have the habit of discarding old phones," was told by counsel to preserve them, and allowed his grandchildren to play with them. ECF No. 40 at 8. They also undermine his claim that he was "aware of a pending criminal investigation years ago." Id. at 5. Rather, as Judge Kuo found, those actions demonstrate his "state of mind . . . which is that he is planning or trying to evade something." Ex. A at 27.

Finally, even while incarcerated, Rubin has used his wealth in an attempt to obtain preferential treatment. He regularly requests that Mary send Zelle and CashApp payments to various individuals to obtain, among other things, transfer to a preferential floor of the MDC—yet a further example of Rubin's mindset that because of his wealth he is above the rules.

* * * * *

Accordingly, Rubin has failed to rebut the presumption that he is a danger to the community and a risk of flight. See Mercedes, 254 F.3d at 436 (requiring defendant to come "forward with evidence that he does not pose a danger to the community or a risk of flight"). Moreover, the government has proven by clear and convincing evidence that Rubin is a danger to the community, and by a preponderance of the evidence that he is a risk of flight.

F.    The Proposed Package Will Not Reasonably Assure the Safety of the Community or Rubin's Appearance in Court

Even if the Court were to find that Rubin had overcome the presumption and entertain a bail package, the proposed package does not mitigate the serious risks of danger and flight present here.

1.    The Proposed Suretors Have No Moral Suasion Over Rubin

The proposed suretors—Mary and Rubin's daughter—have no moral suasion over him. That they may be willing to stand behind him to their own detriment is irrelevant; what matters is whether Rubin will be dissuaded from violating the conditions of his release by virtue of the prospect of harm to them. History shows he will not.

At no time between 2009 to 2022 was Rubin deterred from criminal conduct by the prospect of harming his family. To the contrary, harm to his family was all but certain, irrespective of whether criminal charges were brought. On a near daily basis, he engaged in criminal sexual activity with victims; lied to his family about his whereabouts, his finances and his lease of the Penthouse; and flouted his family obligations. He left his son home alone to have a "quickie" with a victim; engaged in sexual encounters with "two sluts" the week of his anniversary with Mary; and laughed about having sex with Powers in his marital bed. Rubin gives the Court no reason to believe that he has somehow fundamentally changed now. See ECF No. 51 at 5 (providing no new evidence or argument to demonstrate that his suretors will

23

exercise moral suasion over him, and instead relying on "the extensive evidence that we have previously submitted"); Ex. B at 33 (Judge Cho rejecting affidavits and argument that proposed suretors would "hold moral suasion over this defendant" given his ability to live a "double life" of which they were unaware); United States v. Batista, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) ("[A] defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial."). Thus, there is no basis to believe that Rubin will be deterred by the prospect of Mary and his daughter suffering financial harm should he violate the bail conditions, given all that he has already made them endure, in addition to the significant wealth they will retain irrespective of a violation as discussed below.

       2.     Rubin's Family Will Still Have Access to Tens of Millions of Dollars

      The proposed package will leave Rubin's family with tens of millions of dollars, much of which will remain overseas, more than sufficient to facilitate Rubin's flight and to support Rubin and the family for the rest of their lives.

      Per affidavits filed by Rubin, Mary and his daughter, their wealth is as follows:

| | U.S. Assets | Cash Value of Cayman-Based Crown Global Accounts | Total |
|---|---|---|---|
| Rubin | $5.3 million | $38.8 million | $44.1 million |
| Mary | $35.2 million | $53.8 million | $89 million |
| Daughter | $0.15 million | | $0.15 million |
| Trust Policy[6] | | $13 million | $13 million |
| **Total:** | **$40.7 million** | **$105.6 million** | **$146.3 million** |

ECF Nos. 51-1, 51-5, 51-26. Plainly, $70 million is far from substantial for a family that would be left with more than $70 million after Rubin fled. Indeed, the entire bond amount could be recovered against Mary, and she would still have $19 million to support herself and her family. (Of course, Rubin has offered to secure half the bond amount in cash, leaving just $35 million to be recovered against his suretors.) Moreover, given that Rubin's daughter has no ability to pay the bond amount, is already reliant on her parents for financial support, could continue to be reliant on Mary's millions after Rubin's flight, and is herself a beneficiary of a multi-million-

---

      [6]    Rubin's daughter did not account for the Trust Policy in her own valuation, however, she is a beneficiary. See ECF No. 51 at 8 n.9. When and how she can access it, however, is unclear.

dollar trust in the Cayman Islands, Rubin's flight will have little impact on her financially. See ECF No. 51-1 ¶ 2. As Judge Kuo recognized, on the belief then that Rubin only had access to $35 million overseas, "[that] is a lot of money offshore and so it does show that he has an ability to access money that could enable him to flee and go someplace else and evade the authorities." Ex. A at 27.

Further, the present picture of the family's wealth does not account for the fact that the family will receive future income streams through interest earned on their considerable wealth, or Rubin's ability to resume the highly lucrative trading activity that helped build the family fortune. See Maxwell, 510 F. Supp. 3d at 176 (rejecting $28.5 million partially secured bond, supported by accounting records, where it would leave "unrestrained millions of dollars and other assets" and the prospect of future income streams). Thus, the bail application should be rejected, because a $70 million bond will not serve as a deterrence to Rubin, where his family will be left with more than $70 million even after his flight. See Sabhnani, 493 F.3d at 77 (noting deterrent effect of bond is contingent on defendant's overall assets).

3.    The Proposed Trustee Agreement Appears Ineffective and Unenforceable

The government has serious concerns about the disclosures to date and the mechanics of the proposed trustee agreement, which appear toothless and unenforceable.

First, the Court cannot accurately evaluate the efficacy of the proposed measures to impede Rubin's access to overseas assets (such as his resignation as trustee of certain life insurance policies), or the substantialness of Rubin's proposed bond, without a comprehensive accounting of his and his family's wealth. While Rubin and Mary disavow having certain types of investments overseas in carefully worded affidavits, it is unclear if there are other life insurance policies or similar instruments—of which they themselves or their family are the ultimate beneficiaries—that have not yet been disclosed. See ECF No. 51-5 ¶ 4 (Mary claiming, "I have never held any cash or investments of any kind in overseas accounts (emphasis added)); ECF No. 51-26 (Rubin claiming not to have "foreign bank or brokerage accounts," "cash overseas," or "property" overseas). Notably, the value of the Trust Policy is unaccounted for in Rubin, Mary or his daughter's valuations of their own wealth (notwithstanding that his daughter is a beneficiary and Rubin has personally taken loans against that policy of millions of dollars). See ECF Nos. 51 at 8 n.9, 51-1. And Rubin has already lied to Pretrial Services and the government about having access to the Trust Policy, only conceding that he was a trustee of that policy after being confronted by the government. See Epstein, 425 F. Supp. 3d at 324-25 ("The absence of accurate and comprehensive financials, sworn to by the Defendant, does not allow the Court meaningfully to assess Defendant['s] own proposed bail package," particularly where defendant could continue earning money abroad).

Rubin claims, wrongly, that the government "has had substantial insight into Mr. Rubin's financial affairs for some time," because it was able to subpoena his U.S. bank records. ECF No. 51 at 3; see ECF No. 51-21 (summary of subpoenaed U.S. bank records). Yet, he concedes that the bulk of the family's wealth is maintained overseas, in accounts about which the government has limited information. To date, he has provided just 5 pages of records for the

Crown Global policies, showing their dollar value and loans taken against them.  ECF No. 51-35.
He has provided no documentation demonstrating the terms under which they were opened or
how they have been funded; the circumstances under which trustees can be appointed or
replaced; or the identity of the beneficiaries, and how and when beneficiaries can make claims
against the policies.  There are also discrepancies between Rubin's reporting and the
government's records.  Rubin claims that the family has taken out loans against the policies
totaling $56.7 million, ECF No. 51-26 ¶ 8, but U.S. bank records show Rubin alone receiving
disbursements of $63.5 million from banks in the Cayman Islands, all of which create questions
as to the accuracy and completeness of the disclosures to date.

Second, Rubin claims that the Crown Global funds would be "seizable by the
government" should Rubin abscond, because "investments in the policies are all held in the
United States" in a hedge fund (the "Fund").  ECF No. 51 at 5, 11.  As an initial matter, the
government disputes the claim that the foreign insurance policies could be "pierced" to allow
recovery of the underlying assets domestically (a proposition for which Rubin provides no
support).  In any event, that the Fund presently invests heavily (though not entirely) in the United
States is irrelevant where the Fund is entitled to invest in foreign assets, has sole discretion over
investment strategy, and could rapidly change the composition of its investments at any time.
ECF No. 40-15 (acknowledging that the Fund invests in Spanish mortgages); ECF No. 51-36 at
11, 16, 19, 44, 49 (noting Fund's investment discretion and ability to invest in foreign assets).[7]

Finally, the government cannot evaluate the enforceability of the trustee services
agreement without understanding the terms and conditions of the underlying Crown Global
policies, which Rubin has not provided.  (For example, could Mary as "Settlor" of the Trust
Policy override the appointment of Strachman at some later point in time, such as after Rubin's
flight, and appoint her own trustee?)  Nor does Rubin attempt to explain how the trustee
agreement would be enforceable in the Cayman Islands, where the policies are located, without
involvement of a Cayman court.  Even on their face, the proposed terms under which Strachman
would operate as trustee appear utterly toothless.  Nothing in the trustee services agreement
would seem to preclude Strachman from continuing to fund Rubin's "living expenses" after he
absconded.  See ECF No. 51-22.  Rubin could unilaterally terminate the agreement with written
notice.  Id. ¶ 1.  Strachman would be indemnified in almost all circumstances, with Rubin
funding Strachman's legal fees.  Id. ¶¶ 6.1.-6.2.  And Strachman would receive sizable monthly
checks from Rubin.  As courts have recognized, the trustee's financial motive creates an inherent

---

[7]    Notably, the Fund's management includes 

conflict of interest, exacerbated where, as here, the defendant's employees previously engaged in criminal conduct on the defendant's behalf.  See Combs, 2024 WL 4903741, at *3 (rejecting "conditions that place trust in Combs and individuals in his employ—like a private security detail—to follow those conditions"); Epstein, 425 F. Supp. 3d at 326 (acknowledging conflict "created by the salary the 'trustees' are earning from the Defendant and their purported role as independent monitors," which was especially problematic where "it is alleged that employees of the Defendant may have engaged in unlawful acts with and on behalf of the Defendant").  Cf. Sabhnani, 493 F.3d at 79 (approving stringent conditions of release to mitigate flight risk, including restraining orders against all assets owned by defendants and children, with transfers exceeding $10,000 subject to approval by independent accountant answerable to the court).

Thus, the bail application should be rejected, because Rubin has failed to demonstrate the enforceability and efficacy of his proposed terms, including the appointment of a trustee over the Rubin Policy and Trust Policy.

4.    The Monitoring Conditions Are Unlawful and Will Not Prevent Flight

As yet a further example of Rubin using his wealth to attempt to obtain preferential treatment, he requests bail on the condition that he hire at his own expense a private security team.  The Second Circuit has flatly rejected that condition in these circumstances:

> [T]he Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails.  It is a fundamental principle of fairness that the law protects the interests of rich and poor criminals in equal scale, and its hand extends as far to each.  To interpret the Bail Reform Act as requiring district courts to permit wealthy defendants to employ privately funded armed guards where an otherwise similarly situated defendant without means would be detained would violate this core principle.  Such a two-tiered system would foster inequality and unequal treatment in favor of a very small cohort of criminal defendants who are extremely wealthy.

United States v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) (noting such a condition may be considered only "where the defendant is deemed to be a flight risk primarily because of his wealth," such as in Sabhnani).  See ECF No. 51 (Rubin relying on inapposite cases of United States v. Weigand, 492 F. Supp. 3d 317, 319 (S.D.N.Y. 2020), where defendant was a flight risk because of his wealth, and United States v. Akhavan, 2021 WL 5357536 (S.D.N.Y. Feb. 12, 2021), where defendant was released two weeks before trial to ensure he could prepare with counsel during the COVID-19 pandemic).  Here, the defendant is a flight risk primarily because he is charged with crimes of the utmost seriousness, the evidence against him is overwhelming, he is likely to spend the rest of his life in prison, and his actions at the time of his arrest demonstrate he is already preparing for flight, not to mention he is a danger.  In those

27

circumstances—where a defendant of lesser means would be detained—<u>Boustani</u> precludes Rubin from using his wealth to avoid remand through the creation of a privately funded jail.

Nor will the other proposed measures—home detention with electronic monitoring, security cameras with 24/7 monitoring inside his home and surrender of his passport—prevent flight. As the Honorable Alison J. Nathan recognized, "home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start." <u>Maxwell</u>, 510 F. Supp. 3d at 172. There are numerous examples of defendants in this District cutting their ankle monitors and fleeing overseas, many of whom remain fugitives, underscoring the ease with which defendants can flee.[8] As to the security feed, what it would show is that

---

[8]     See <u>United States v. Svetlana Dali</u>, 24-MJ-645 (JAM) (defendant cut location monitoring device and absconded to Canada, where she was apprehended at the border); <u>United States v. Horst Jicha</u>, 23-CR-342 (OEM) (same the day before a status conference and he remains at large); <u>United States v. Tony Clanton</u>, 23-CR-328 (KAM) (defendant cut his location monitoring device on the eve of trial); <u>United States v. William Bartell</u>, 22-CR-80 (EK) (same within one week of being released on bail); <u>United States v. Joey Macario</u>, 22-CR-342 (HG) (defendant absconded after removing his location monitoring device after being released to attend drug treatment); <u>United States v. Dewayne Tripp</u>, 22-CR-336 (MKB) (defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); <u>United States v. Marius Lacatis</u>, 22-CR-190 (BMC) (defendant, a Romanian national involved in a fraud conspiracy, was released on bond, cut his location monitoring device, fled and remains at large); <u>United States v. Marcus Deloatch</u>, 21-CR-457 (ENV) (defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); <u>United States v. Herman Baron</u>, 21-CR-307 (NGG) (defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled one hour before his scheduled change-of-plea hearing and was only re-apprehended five months later); <u>United States v. Michael Artis</u>, 20-CR-409 (PKC) (defendant released following a violation of supervised release cut off his location monitoring device and failed to appear at bail revocation hearing); <u>United States v. Charles May</u>, 19-CR-539 (FB) (defendant charged with several counts of armed robbery absconded while on home detention and remains at large); <u>United States v. Theressa Riddle</u>, 17-CR-491 (JS) (defendant released on bond cut her location monitoring device and did not appear for bond violation hearing); <u>United States v. Sinmyah Amera Ceasar</u>, 17-CR-048, 19-CR-117, 22-CR-459 (KAM) (defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and government discovered evidence of violation of her release conditions); <u>United States v. Guanghua Shen</u>, 18-CR-302 (MKB) (defendant cut her electronic monitoring device at JFK airport the day before she was required to self-surrender to the Bureau of Prisons); <u>United States v. Akmal Narzikulov</u>, 13-CR-601 (RJD) (defendant cut his electronic bracelet just days after being released on bail); <u>United States v. Julian Tzolov</u>, 08-CR-370 (JBW) (defendant in a securities fraud scheme attempted to flee to Spain while on location monitoring).

Rubin went outside—it would not prevent him from leaving, nor would it give law enforcement any indication of where he went or how.

Courts have rejected bail on conditions similar to those proposed here where defendants were charged with extensive sex crimes, like Rubin.[9]  See, e.g., Alexander, 24-CR-676 (VEC) (S.D.N.Y.), Dkt. No. 37 at 119-20 (rejecting $115 million partially secured bond, with private security guards and extradition waivers, where defendants were charged with sex trafficking and presented both danger and flight risk), aff'd, No. 25-222 (L) (2d Cir. 2025); United States v. Combs, 2024 WL 4903741, at *3 (S.D.N.Y. Nov. 27, 2024) (rejecting bail application involving private security and questioning "sufficiency of any conditions that place trust in Combs and individuals in his employ—like a private security detail—to follow those conditions"); Maxwell, 510 F. Supp. 3d at 177 (rejecting partially secured bond involving GPS monitoring, release to family-member third-party custodian, and "on-premises security guards" as insufficient to alleviate risk of flight).  By contrast, in United States v. Sabhnani, the Second Circuit found that there were conditions of release that could mitigate risk of flight, where defendants did not present a danger, did not have "any type of direct access, to financial accounts abroad," had furnished "15,000" pages of records to prove their financial history, had wealth of $5 million, and agreed to fully secured bond, private security, restraining orders for accounts owned by them and their family, and computer monitoring of them and their family, among other stringent conditions.  Sabhnani, 493 F.3d at 68-70, 73-74.

###### 5.    The Proposed Conditions Will Not Alleviate Danger

Finally, the proposed package will not reasonably assure the safety of the community.  Rubin used an army of co-conspirators to recruit and traffic victims to travel to meet him for commercial sex.  After the Civil Case was filed, he continued that activity outside New York, meeting victims in Nevada and the Bahamas.  He and his co-conspirators relied on encrypted applications like WhatsApp; sophisticated maneuvers to obscure the true nature of

---

[9]    The cases on which Rubin relies are inapposite.  See ECF No. 51 at 13.  In United States v. Jeffries, No. 24-CR-423 (NJC) (E.D.N.Y.), Dkt No. 9, the government consented to bail for the former Abercrombie & Fitch CEO in light of, among other things, his age (80 years old), reported medical conditions, which are the subject of competency proceedings, and the absence of evidence that he attempted to tamper with witnesses or obstruct justice.  United States v. Fox, No. 22-CR-53 (W.D.N.Y.) is even more dissimilar.  There, the defendant was charged with drug trafficking and sex trafficking over a three-year period.  The defendant did not have Rubin's wealth, did not operate a trafficking network nearly as extensive or sustained as Rubin's, and the defendant agreed to even more stringent conditions than those Rubin proposes, including computer and internet monitoring.  And nonetheless, the Second Circuit recognized that Fox's case was "an extremely close call even considering the highly restrictive conditions in the release order, and it may very well be that any loosening of conditions or more compelling evidence presented by the Government could well tip the balance in favor of pretrial detention."  United States v. Fox, 2022 WL 2564600, at *3 (2d Cir. Jul. 8, 2022).  Neither supports Rubin's release.

their financial transactions; and even resorted to use of the dark web.  The criminal sex acts took place in private homes and hotels, behind closed doors—precisely the kind of violence that strict conditions cannot prevent.  And Rubin was unrelenting in pressuring victims involved in or on the precipice of litigation to deter them from legal recourse.  Rubin's ability to continue this conduct if released—where he will live alone in Connecticut, with access to the Internet, encrypted applications, and multiple electronic devices—underscores that detention is necessary to reasonably assure the safety of the community.  See Combs, 2024 WL 4903741 (S.D.N.Y. Nov. 27, 2024) (finding no conditions of release would assure safety of community where defendant had history of violence, witness tampering and dishonesty).

VI.    Conclusion

      For the foregoing reasons, the government respectfully requests that the Court deny Rubin's application for bail, because he has failed to rebut the presumption of detention, and because he presents a significant danger to the community and flight risk.

      Respectfully submitted,

      JOSEPH NOCELLA, JR.
      United States Attorney

By:    _____/s/_____
      Tara McGrath
      Raffaela Belizaire
      Assistant U.S. Attorneys
      (718) 254-6454/6295

Enclosures

cc:    Clerk of Count (by ECF)
       Counsel of Record (by ECF)