# EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,    : 25-cr-00281-BMC
                          :
                          :
    - versus -        : U.S. Courthouse
                          : Brooklyn, New York
HOWARD RUBIN,              :
                          : October 20, 2025
                 Defendant  : 11:26 a.m.
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR ARRAIGNMENT
AND BAIL HEARING
BEFORE THE HONORABLE JAMES R. CHO
UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


<u>**For the Government**</u>:      **Joseph Nocella, Esq.**
                                 Interim United States Attorney

                          BY:   **Tara B. McGrath, Esq.**
                                 Assistant U.S. Attorney
                                 271 Cadman Plaza East
                                 Brooklyn, New York 11201


<u>**For the Defendant**</u>:       **Michael J. Gilbert, Esq.**
                                 Sheppard Mullin Richter &
                                  Hampton LLP
                                 30 Rockefeller Plaza
                                 New York, NY 10112

                                 **Benjamin E. Rosenberg, Esq.**
                                 Dechert LLP
                                 1095 Avenue Of The Americas
                                 New York, NY 10036



<u>**Transcription Service**</u>:   **Transcriptions Plus II, Inc.**
                                 61 Beatrice Avenue
                                 West Islip, New York 11795
                                 RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE CLERK:  This is a Criminal Cause for a Bail

2   Application, *USA v. Howard Rubin*, case number 25-cr-281.

3          Counsel, your name for the record?  Appearing

4   for the government?

5          MS. MCGRATH:  Good morning, your Honor.  Tara

6   McGrath for the government and I'm joined at counsel's

7   table by paralegal specialist Marlane Bosler.

8          THE CLERK:  Thank you.  And appearing for Mr.

9   Rubin?

10          MR. GILBERT:  Good morning, your Honor.

11   Michael Gilbert and Benjamin Rosenberg on behalf of Mr.

12   Rubin.

13          THE COURT:  Thank you very much.

14          THE COURT:  All right.  Good morning, everyone.

15   Just to confirm, are you Howard Rubin?

16          THE DEFENDANT:  I am.

17          THE COURT:  Hi.  I'm Judge Cho.  How are you

18   doing?

19          THE DEFENDANT:  I'm okay.

20          THE COURT:  All right.  I understand we need to

21   do an arraignment on the indictment.  Is that correct?

22          MS. MCGRATH:  Yes, your Honor.

23          THE COURT:  All right.  Counsel, I have in

24   front of me a superseding indictment, docket number 21

25   that was filed on September 30, 2025.

Proceedings

1          Now, Mr. Rubin, in this superseding indictment

2   you have been charged by a grand jury with these counts.

3   I'll identify them for you.

4          Count 1, sex trafficking, Jane Doe's 1 through

5   5.

6          Count 2, sex trafficking, Jane Doe number 6.

7          Counts 3 through 8, Mann Act transportation

8   violations.

9          Count 9, again, Mann Act transportation

10  violations.

11         And Count 10, bank fraud.

12         There are forfeiture allegations as well.

13         Mr. Rubin, have you received a copy of the

14  superseding indictment?

15         THE DEFENDANT:  I have.

16         THE COURT:  All right.  And have you had a

17  chance to discuss these charges with your lawyer?

18         THE DEFENDANT:  Yes, I have.

19         THE COURT:  All right.  And do you understands

20  the charges against you?

21         THE DEFENDANT:  Yes, I understand them.

22         THE COURT:  All right.  Mr. Gilbert, let me ask

23  you does your client want the charges read out loud or

24  does he waive reading?

25         MR. GILBERT:  We waive the public reading, your

1    Honor.

2         THE COURT:  All right, Mr. Rubin, how do you

3    plead to the charges; guilty or not guilty?

4         THE DEFENDANT:  Not guilty, your Honor.

5         THE COURT:  All right.  In terms of the

6    indictment, anything else I need to address today, Ms.

7    McGrath?

8         MS. MCGRATH:  No, your Honor.

9         THE COURT:  Okay.  All right.  We're here for a

10   hearing on the bail package.  Mr. Gilbert, have reviewed

11   your submission.  I've also reviewed the government's

12   response which was filed yesterday.  Mr. Gilbert, do you

13   want to be heard on your motion?

14        MR. GILBERT:  Yes.  Thank you, your Honor.

15        THE COURT:  All right.  Go ahead.

16        MR. GILBERT:  We request Mr. Rubin's release on

17   the conditions set forth in our letter.  It's a very

18   substantial bail package.  We respectfully submit that it

19   is more than adequate to ensure Mr. Rubin's appearance in

20   court and address what the government claims is a danger

21   to the community.

22        Mr. Rubin is a 70-year-old man who recently

23   suffered a stroke.  He has no criminal history.  He's

24   been keenly aware he was under federal investigation for

25   years.  Within the last year his counsel was in contact

Proceedings

1  with the U.S. Attorney's Office about this investigation.

2  He did not flee, he did not buy property in another

3  country, he did not leave, he did not transfer assets.

4  The government has no evidence to suggest otherwise.

5          The conduct that is the focus of this

6  indictment primarily has been fully and publicly exposed

7  in a civil case that went to trial in this courthouse in

8  2022.  These are lurid, ugly allegations no doubt, but he

9  didn't run away from them then.  He faced them head on.

10  He took the stand, he testified in the civil trial.  He

11  has no ties to any other country.  He has spent his

12  entire life here.  He has not traveled outside the United

13  States for over eight years.

14          And as the Court knows, we have submitted a

15  letter, a very powerful letter from Mary Henry, Mr.

16  Rubin's wife who has filed for divorce yet submitted a

17  letter extolling his commitment to his family and

18  asserting her belief that he will stay here and face

19  these charges.

20          She's provided -- she's willing to cosign a $50

21  million bond and post cash and property in support of

22  this application.  She's here today.

23          Even on the government's account of what

24  happened here, Judge, there are no allegations of any of

25  the type of BDSM activities taking place after 2019.  For

1  the last six years, Mr. Rubin has been devoting his time

2  and attention to his grandchildren.  And we have

3  submitted letters of support that attest to this.  That

4  is what he has been doing.

5          Let me summarize briefly the bail proposal and

6  I would like to address some of the specific points the

7  government has raised about risk of flight and danger to

8  the community.

9          As I said, it's a substantial package.  It's in

10 our letter.  It's $50 million personal recognizance bond.

11 It will be signed by Mr. Rubin, by Ms. Henry, and by his

12 daughter.  It's got $6 million in cash, a home that Ms.

13 Henry owns in Connecticut with approximately $1.6 million

14 in equity, and a home his brother Jonathan owns in

15 Connecticut with approximately $1 million.  That is his

16 primary and only residence.  It's got 8.5 million in

17 value approximately to secure the bond.

18         His assets, and we talk about this in the

19 letter and as the Court knows from the prior proceeding

20 that you have the transcript of, the government has an

21 issue about a life insurance policy that Mr. Rubin owns.

22 As part of this bail package, he will relinquish his

23 right to access funds from that policy that holds almost

24 the entirety of his net worth.

25         The independent trustee would be appointed and

Proceedings

1    that person will be empowered to only allow funds to be

2    used for living expenses, medical, and legal bills.  That

3    should address, and we respectfully submit that it does

4    address, the government's assertion that simply because

5    someone has access to funds they're going to flee.

6            He will not be able to access that cash to

7    leave the country.  He'll be under home detention, 24/7

8    security cameras.  He will surrender his passport.  And

9    these conditions are more than sufficient to ensure he

10   will appear, your Honor.

11           His ties, as I said -- let me address some of

12   the risk of flight factors.  Again, his ties are profound

13   to this country.  And despite the government's assertions

14   to the contrary, it's undeniable.  His daughter Anna Lee,

15   who lives in Connecticut -- and as I said for the last

16   seven years, this is what Mr. Rubin has been doing.  He's

17   lived hear her and devotes his time to helping care for

18   her three children.  She's got a forth child that she's

19   due in just a few weeks.  There's been periods where he

20   would act as a primary caregiver for those children.  And

21   again, we've provided letters from his daughter, from

22   people in the community who attest to this.

23           One of the letters is from his daughter, Anna

24   Lee.  And as I said, she attests to his schedule.  This

25   is Exhibit C to our submission.  This is his weekly role.

Proceedings

1  He picks up the children from school four afternoons a

2  week, he takes them to after school activities including

3  tap dance, ballet, gymnastics, and swimming.  It's all

4  laid out in her letter.

5         I'd also refer the Court to the letter I

6  mentioned from Ms. Henry who concludes by saying he would

7  never abandon his family.  He has always placed them at

8  the center of his life and they remain his greatest

9  source of strength.  I believe in his commitment to his

10  family.  I'm not concerned he would flee from his

11  obligations under bail.

12         And now as I said, he did suffer a stroke.  He

13  suffered a stroke in July.  He is receiving treatment and

14  medication for that.  I think that factor also should

15  lead the Court to conclude that it's unlikely, in

16  addition to all the other reasons, that he would flee.

17         The government has raised issues about his

18  passport.  His passport is here.  He will surrender his

19  passport.  Frankly, it confirms what we've said about his

20  lack of ties to any other country.  He hasn't traveled

21  outside the United States in eight years.  There were

22  some -- the government asserts that he misled the agents

23  when they came to arrest him about the location of his

24  passport.  We dispute that.  But the fact is it's been --

25  we have it.  He's prepared to turn it over as far as this

Proceedings

1    bail package, and it shows he doesn't have ties outside

2    of the United States.

3            The government also made arguments about the

4    fact that there were electronic devices that were seized

5    from his home.  We don't see how that is in any way

6    evidence of him fleeing or intending to flee.  We

7    addressed it thoroughly in our submission.  But I think

8    it's fair to say that nobody keeps three old Blackberries

9    and an iPod to facilitate fleeing the country ahead of

10   the FBI.  It wouldn't help.

11           He did keep old devices, as we say in the

12   letter, because there was civil litigation and frankly,

13   he was advised, and he followed the instructions, that he

14   should not destroy devices that might contain relevant

15   communications, and he didn't do so.

16           The government's submission also relies on

17   cases in which defendants are charged with sex

18   trafficking but those cases are very different and they

19   insist that they reflect that the routine, orders of

20   detention are routine in such cases but they're very

21   different.  Those are cases that involve people in some

22   cases they were not U.S. citizens, they had very

23   significant ties with other countries, or they were drug

24   addicts.  None of those factors apply to Mr. Rubin.

25           Now, let me address some of the points about

Proceedings

1  danger to the community.  And the primary argument we

2  have on that is one I've already mentioned that this

3  conduct is old.  We don't have the evidence yet, but the

4  government on its own assertions, they're not alleging

5  that there's any BDSM activity after 2019, so it's been

6  years, years.  And he is been under investigation, we

7  don't know exactly for how long, but it seems for years

8  and the government hasn't moved to do anything up until

9  now.  So it's difficult to understand how they view him

10 to be a danger to the community.  They would have acted

11 sooner if that was the case.

12        In general, the type of conduct that's alleged

13 here doesn't give rise to concerns about the community at

14 large.  It is private sexual activity involving adults.

15 It is BDSM.  There's no question about that.  But the

16 record I believe from the civil trial speaks for itself

17 and I think the gist of it, your Honor, was that it

18 involved allegations from adults who voluntarily traveled

19 to New York City from out of state and agreed to engage

20 in sadomasochism with Rubin.  They alleged that he went

21 too far.  But that was the heart of that case.  And what

22 I'm reading from is Judge Cogan's opinion on the post

23 trial motion at page 2.  That's the summary of those

24 types of allegations.

25        So it wasn't that -- these people were known to

Proceedings

1  him.  The evidence at trial, there was extensive text

2  messaging that demonstrated that Mr. Rubin was up front

3  and described that this was going to be BDSM.  There was

4  extensive text messaging admitted at the trial that

5  showed that even after these encounters the women were

6  complementary toward Mr. Rubin.  All but one returned for

7  additional encounters.  So that is just the type of

8  activity that the civil trial involved.

9          And I will say one notable aspect of the

10 government's indictment is that there are four Jane Doe's

11 in this indictment who are also plaintiffs in the civil

12 case but only one of those Jane Doe's does the government

13 allege to be a victim of trafficking.  The others they

14 include only in the Mann Act.  That to me suggests that

15 they have reviewed the civil case and they understood

16 that there was a reason why they shouldn't name them as

17 victims of sex trafficking.

18          Now, let me address -- there's an allegation

19 about a hitman.  When we heard that, frankly, in the

20 government's presentation at the initial presentment it

21 was shocking to us to hear.  And so we went to the

22 government immediately after that healing and we asked

23 them to see all the evidence that relates to that and to

24 their credit, even though they didn't have to give us

25 discovery, they did.  And they gave us two 302s, two

Proceedings

1    witness statements, both of them from this year.  We

2    don't know who the person is because it's a Jane Doe and

3    they haven't disclosed any of the identities.  And what

4    it says is that there's a statement in 2024 that at some

5    point, perhaps years earlier, Mr. Rubin "once implied

6    that he asked Powers about a hitman."  So it's extremely

7    thin.  They have apparently no corroboration to suggest

8    that any steps were taken.  There's reference to going on

9    the dark web but they haven't produced any internet

10   searches or any electronic evidence to suggest that any

11   of that ever happened.  There's no contemporaneous

12   emails, text messages, anything of that sort.

13           So we respectfully request that the Court not

14   credit an allegation like that without giving us the

15   opportunity to question the witness who is making such an

16   assertion.

17           The government doesn't claim a hitman was ever

18   hired or engaged to hurt anybody.  So really it's

19   unsubstantiated, an anonymous statement made years after

20   the fact about something that never happened.  It

21   deserves no weight.

22           So for the reasons set forth in our letter and

23   as I've just described, your Honor, we believe that our

24   bail package is more than sufficient to assure the

25   appearance of Mr. Rubin and we respectfully request the

Proceedings

1  Court enter an order to that effect.

2          THE COURT:  Ms. McGrath, do you want to be

3  heard?

4          MS. MCGRATH:  Yes, your Honor.  As an initial

5  matter, there was an extensive hearing before Judge Kuo

6  during which she considered many of these same arguments

7  and rejected them and the Court today should do the same.

8          Starting with a hitman, the government did

9  furnish two witness statements from an individual known

10  to the government and known to the grand jury who was

11  identified as Jane Doe number 7.  This is not an

12  anonymous source but someone who's made herself available

13  to law enforcement.  And she told law enforcement he once

14  made comments to her about hiring a hitman to target the

15  women who had filed the civil suit.  He had looked on the

16  dark web and made contact with a hitman but said that it

17  was too much money which seemed very real to Jane Doe 7.

18  She did not think Rubin was lying.  He was getting off on

19  talking about this.  He said these women were stupid

20  whores he met on Instagram.  That victim also indicated

21  that she was willing to testify to anything she told the

22  agents.

23          Respectfully, as Judge Kuo found, that is a

24  specific statement from a specific individual with

25  considerable detail and it should be credited.

Proceedings

1      Defense counsel's suggestion that there should

2  be some record of the defendant going on the dark web,

3  (indiscernible) of what the dark web is.  The reason

4  criminals use it is because it is hard to detect and

5  trace their activity.

6      Moreover, whether or not Howard Rubin went on

7  the dark web as he claimed to Jane Doe 7 misses the

8  point.  By telling Jane Doe 7 that he was trying to find

9  someone to harm and kill people who had pursued

10 litigation against him, he was sending a very clear

11 message to Jane Doe number 7 and that message was

12 received.

13     Going to the beginning of counsel's statements,

14 they repeatedly suggest that this bond package is very

15 substantial but the Court has no ability to discern that.

16 We have no transparency as to the defendant's actual

17 financial situation or that of his family.  We know that

18 he has very significant assets overseas and we know

19 little about his domestic assets.

20     As the government outlines in its letter in

21 response, it's unclear that we could recover $50 million

22 if the defendant were to flee because it seems this

23 family parks most of their money in the Cayman Islands.

24     The defendant has also been dishonest about his

25 financial picture.  Counsel represented to the government

Proceedings

1   that the only foreign policy to which he had access was

2   his own life insurance policy.  The government then went

3   back to counsel and said we actually see the defendant

4   receiving money from the Cayman Islands from three

5   different account numbers.  It was only then that they

6   disclosed oh yes, actually he's a trustee on another

7   policy.  And separately from IRS filings we know that

8   policy is valued at approximately $20 million.

9          Defense counsel proposes that the defendant

10  could just resign as trustee but his two brothers are

11  still trustees of that account.  So even with all their

12  proposals, the defendant and his family will be left with

13  tens of millions of dollars in the Cayman Islands that

14  they can use to support his flight.

15          He also claimed that he was keenly aware of

16  this conduct for years and years and years and never did

17  anything.  We submit that that's not true.  He may have

18  suspected that there was an investigation but it wasn't

19  until he was arrested that he knew what the charges were

20  and the penalties he was going to face.  At that time, he

21  already had considerable funds in the Cayman Islands.  He

22  refused to provide his passport to law enforcement.  And

23  on this point we want to be very clear.  When he was

24  arrested and when law enforcement said where's your

25  passport, he refused to tell them.  He did not say I do

Proceedings

1  not know, I cannot recall, I do not remember.  He

2  refused.  He was with law enforcement for hours.  At no

3  time during that period did he say he didn't remember

4  where it was.  That we submit evidences his intent to

5  flee.

6          He also had a number of new cell phones.

7  Counsel claims he had this habit of having old cell

8  phones lying around and so that's just because he was

9  involved in the civil case.  He had two new iPhone 16

10 Pros in boxes, one of which was hidden in a tent box.

11 Again, that evidences his intent to flee.

12         Defense counsel is also trying to draw

13 parallels between the criminal case and the civil case.

14 To be clear, there are a number of different victims in

15 this case.  We submit very little could be concluded

16 about our charging decisions as to the trafficking

17 victims because if the defendant is convicted on any of

18 the trafficking counts, if he's convicted with respect to

19 just one Jane Doe, his statutory minimum penalty is 15

20 years and his guidelines are in the hundreds of months.

21 If he is convicted on just one victim, he will very

22 likely spend the rest of his life in jail.

23         Under those circumstances, we submit the Court

24 should not draw any conclusions about the strength or

25 lack of strength of evidence with respect to any other

Proceedings

1   victims because here we're talking about such significant

2   sentences with just one victim and we've charged very

3   many.

4           In terms of the strength of the evidence,

5   defense counsel also ignores in its oral submission and

6   in its written submission the fact that because there was

7   a civil case the defendant has already conceded to much

8   of the conduct that comprises the Mann Act transportation

9   counts.  Each of those counts carries a maximum penalty

10  of ten years imprisonment.  And we submit there's no

11  defense to any of them.

12          Defense counsel spends much time in its papers

13  talking about the defendant's strong family ties.  But as

14  we show in our opposition, the record in no respect

15  supports his claim that he is a devoted family man who is

16  committed to his family.  What it instead shows is that

17  during the relevant period the defendant flouted his

18  obligations to his family, lied to them, and engaged in

19  conduct that would necessarily cause them considerable

20  harm whether or not he was ever charged criminally.

21          History shows us that harm to his family was

22  not a deterring effect then and it certainly won't be

23  now.  He's given this Court no reason to believe the

24  circumstances have changed.  And in fact, now that he is

25  faced with the prospect, the very real prospect of

Proceedings

1  spending the rest of his life in jail, he's more

2  incentivized than ever to flee and evade this

3  prosecution.

4          As to the defendant's medical condition,

5  nothing in the record supports any suggestion that it's

6  an impediment to flight.  He appears to be very active

7  with his grandchildren.  He's taking two medications.

8  He's seen doctors.  Again, they've provided nothing to

9  suggest that those conditions couldn't adequately be

10 handled by a doctor in another country or frankly by the

11 MDC as they have been until now.

12          Finally, I want to discuss generally just

13 efforts of witness tampering.  The government profit five

14 different examples of the defendant and his co-defendant,

15 Jennifer Powers, tampering with witnesses.  We supported

16 those examples with reference to specific Jane Doe's from

17 who the information came, with text messages, and with a

18 letter that the defendant sent.  In two examples, those

19 communications were in the context of ongoing litigation.

20 The defendant had no qualms about reaching out to those

21 victims directly notwithstanding that they were embroiled

22 in litigation and clearly had representation.

23          Shockingly, as to the letters he sent to Jane

24 Doe number 5 on the precipice of her own case, apparently

25 his lawyers blessed that communication.  That

Proceedings

1   communication is clearly threatening.  That it does not

2   threaten violence has no bearing on finding that this was

3   in fact an attempted witness tampering.  And the

4   government cited to a Second Circuit case on that point

5   in its opposition.

6          Given the defendant's history of witness

7   tampering and the fat that he is more incentivized than

8   ever to try to tamper with witnesses now, the Court

9   should find that he does present an ongoing danger.  And

10  as Judge Kuo found, no bond condition can reasonably

11  assure the safety of the community in those

12  circumstances.

13         THE COURT:  All right.  Anything else, Ms.

14  McGrath?

15         MS. MCGRATH:  Unless the Court has any

16  questions, no, your Honor.

17         THE COURT:  All right.  Mr. Gilbert, anything

18  else?

19         MR. GILBERT:  Very briefly.  I'd like to

20  respond to a few of the points.

21         On the witness tampering, I will say that the

22  civil case proceeded, it was filed in 2017, it went to

23  trial in 2022 and in all that time we're not aware of any

24  claim being made that Mr. Rubin did anything to tamper

25  with those individuals.  They came to court, they

Proceedings

1  testified in the trial.  I'm certain that Judge Cogan

2  would have been made aware if there was any such claims.

3  There were none.

4          With regard to the Mann Act, I will say that

5  our preliminary analysis of the guidelines suggests that

6  even if the government were to achieve convictions on all

7  of them, it's in the range of 41 months, 41 to 51 months

8  guideline range.  Don't hold me to that.  You know,

9  there's enhancements and I'm sure the government may have

10 a different view.  But we're just not talking about a

11 situation where that would give him, you know, a

12 sufficient -- that he wouldn't be looking at any

13 mandatory minimums and he could possibly get even lower

14 than that if it came to that, Judge.

15         And with regard to the funds, I just want to

16 make clear we submitted an affidavit from his financial

17 advisor that he doesn't have accounts, brokerage

18 accounts, in the Cayman Islands.  What he has is an

19 insurance policy.  The insurance company is in the Cayman

20 Islands.  But the funds, and it's set forth in the

21 affidavit from the financial advisor, within that policy

22 are invested in stocks, bonds, and other instruments.

23 And the investing is done in a brokerage account that is

24 in the United States.  So the government can, if they

25 were in a position where they had to enforce the bond,

Proceedings

1 access those funds.

2     And so for those reasons, Judge, we submit that

3 our package is more than sufficient to assure his

4 appearance.

5     THE COURT:  Let me ask you a few questions.  So

6 the government has questions about your client's

7 financial transparency.  In their papers they said a few

8 times that they're not quite clear what funds he has

9 either domestically or internationally.  How would you

10 address that concern?

11     MR. GILBERT:  Well, it's our understanding, and

12 we have again the affidavit from his financial advisor to

13 support this, that his primary wealth is in this one

14 insurance policy that is in his name.  He does have other

15 accounts.  I don't know the exact amounts.  But in any

16 event, to address that concern, our proposal would be

17 that this individual at takes ownership of the insurance

18 policy would be, would also have ownership of any other

19 accounts that he has.  I believe he did disclose some

20 other accounts in his Pretrial Services submission.  And

21 we're prepared to submit a detailed financial statement

22 and we would lay out exactly what accounts would be taken

23 over by this trustee so that he doesn't have access to

24 those accounts.  I think that should more than suffice.

25     This is not a financial fraud case.  And in a

1   lot of these, you look at some of the bail packages and,

2   you know, in Madoff and those types of cases, this is not

3   a situation where he's accused of taking investor funds.

4   You know, it's his money.  And we're trying to address

5   the government's concern that just because someone has

6   access to a lot of money they could potentially leave.

7   Frankly, we've gone overboard in that respect because

8   he's willing to basically turn over his assets to a

9   trustee to address that concern.

10          THE COURT:  It seems to me that another concern

11  that the government has is witness intimidation.  All

12  right?  And I'm mindful that there are no allegations

13  post 2019 in the indictment against the defendant.  So in

14  a sense some of the allegations are a bit dated.  But

15  they are concerned about witness intimidation.  What do

16  you think your package does to assure this Court that

17  there won't be any witness intimidation going forward?

18          MR. GILBERT:  Well, one of the provisions would

19  be that he have no contact with any of the Jane Doe's,

20  his co-defendants, or any potential witness.  That would

21  be an order and we would certainly consent to that.

22          You know, what the government asserts is

23  witness tampering frankly we disagree.  We don't think

24  it's witness tampering for somebody to send a letter to

25  somebody saying that if you proceed to sue me, the

1   following facts will be revealed in a public forum.

2   That's true.  And the government thinks that it's

3   overbearing.  I think an argument can be made if it came

4   from counsel it would have been received as not

5   overbearing.  But it's not, in our view, witness

6   tampering in any respect.

7           And you know, I think we've addressed the --

8   oh, and the other assertion is that hiring private

9   investigators is witness tampering or somehow instructive

10  conduct and we just, we don't agree with that.  And its

11  common practice.  There was civil litigation.  Through

12  counsel, private investigators were retained and frankly,

13  that's normal.  I don't think there's anything

14  inappropriate about it.

15          And again, we've had the experience of all

16  these years of litigation including in front of this

17  Court.  There hadn't been any credible allegations of him

18  doing anything to prevent anybody from coming forward if

19  that's what they choose to do.

20          THE COURT:  All right.  Ms. McGrath, let me ask

21  you a question.  This alleged hitman comment, when was

22  that made?  When was the statement made to the witness?

23          MS. MCGRATH:  Your Honor, that witness last saw

24  the defendant in approximately 2019 and she reported it

25  to the FBI in 2024.

Proceedings

1          THE COURT:  As far as you're aware though, were

2    there any witnesses that were going to -- well, maybe

3    defense counsel knows better, were there any witnesses

4    that were going to testify in the civil proceeding that

5    did not testify for whatever reason and that the

6    government argued there was some sort of intimidation as

7    to those witnesses?

8          MS. MCGRATH:  Your Honor, that is not something

9    to which we would have been privy, but respectfully, as

10   Judge Kuo found, the defendant's efforts are what's

11   important, his attempt to intimidate them.  Whether he

12   was successful or not is not really the point.  And the

13   fact that people did in fact testify and were brave

14   enough to do so, reflects their courage and strength as

15   opposed to his intent to tamper with the trial.

16         THE COURT:  But in terms of the allegations of

17   witness tampering, is there anything post 2019 from your

18   perspective?

19         MS. MCGRATH:  No, your Honor.  But I will note

20   this case involves many different victims in the civil

21   case, some of whom have never been party to litigation

22   with the defendant.  And the defendant will also receive

23   in discovery significant volumes of material that reflect

24   a number of other individuals with whom he had commercial

25   BDSM sex and engaged in extremely violent and in some

1  instances not consensual conduct.  It's not clear to us

2  that he knows that the government is in communication

3  with them.  So the scope of what we're discussing is not

4  a number of civil plaintiffs who've already litigated

5  this matter, but not only the ten Jane Doe's charged in

6  our indictment and all the other individuals who have

7  come forward to the FBI.

8          THE COURT:  Are you aware of any allegations of

9  intimidation after 2019 though?

10          MS. MCGRATH:  No, your Honor.

11          THE COURT:  All right.  And then are you aware

12  of any other allegations regarding sex trafficking post

13  2022?  Is that correct?

14          MS. MCGRATH:  Your Honor, the defendant -- the

15  last sex crime was charged in 2019.  The defendant is

16  charged with bank fraud in 2020 and 2022.  And as we note

17  in our submission, the defendant's failure to be

18  (indiscernible) in his financial disclosures continue

19  through this day through his tax filings and submissions

20  to the IRS.

21          THE COURT:  Understood.  So you've indicated in

22  your papers that you're concerned about the defendant

23  being fully transparent with his financial records.  What

24  more do you need from the defendant for you to be assured

25  that he has provided to you all of his financial

Proceedings

1  information?

2          MS. MCGRATH:  He's provided none, your Honor.

3  He was interviewed by Pretrial Services and indicated his

4  assets in an unsworn statement, and he filed an affidavit

5  from his accountant which speaks only to the Crown Global

6  policy.  It does not represent that he holds no other

7  foreign assets.  And as we know, the defendant has been

8  lying to that accountant.  The government interviewed

9  that individual and he did not know that for years the

10  defendant had been sending millions of dollars, in excess

11  of $9 million, to Jennifer Powers and her husband.

12          So we submit even that accountant does not have

13  a full financial picture from the defendant.

14          THE COURT:  All right.  Mr. Gilbert, do you

15  want to address any of those points?

16          MR. GILBERT:  Well, as I said, your Honor, we

17  would submit a financial statement that sets forth all of

18  his accounts.  And we're prepared to do that.  And as I

19  said, we're prepared to ensure that he doesn't have the

20  ability to access the cash.  That will be -- the

21  ownership of those accounts will be transferred to a

22  trustee.

23          THE COURT:  Anything else, Ms. McGrath?

24          MS. MCGRATH:  Your Honor, that presumes though

25  that the defendant is in the first instance forthcoming

1    in what financial accounts he has, and it doesn't address

2    the separate concern that the defendant's family has

3    access to tens of millions of dollars offshore.

4        And so if the defendant says I'm relinquishing

5    access to my life insurance policy and resigning as a

6    trustee on the trust policy, that still leaves tens of

7    millions of dollars in his wife's life insurance policy

8    and in the trust policy to which his brothers continue to

9    be trustees.

10       So in short, those proposals still give him

11   tens of millions of dollars to use in support of his

12   flight provided his family is willing to facilitate it.

13       MR. GILBERT:  Judge?

14       THE COURT:  Go ahead.

15       MR. GILBERT:  His brother is going to be

16   signing the bond.  He'll be on the hook for $50 million.

17   His wife is signing the bond.  She'll be on the hook for

18   $50 million.  I don't know what accounts overseas they're

19   talking about.  And it's an insurance policy.  And we

20   understand that there are insurance -- there are two

21   other policies.  One is held by a trust.  He's going to

22   resign.  He's going to turn over any rights he has in

23   that.  And one is held by his wife.

24       So I don't think that there really are -- I

25   think there's burden shifting going on here.  We can't

Proceedings

1 prove the negative.  He will submit an affidavit

2 explaining what he has.  If the government has evidence

3 that he has some other accounts, then they'll bring it to

4 our attention.  But we're not aware of it.  We have no

5 reason to believe that there are any, that there is

6 anything else.

7        Oh, I stand corrected.  His brother would lose

8 his home.  He's not proposed to be a cosigner.

9        THE COURT:  All right.  So let me ask you about

10 the numbers.  I'm looking at paragraph B of your letter,

11 the first page.  So you've indicated that there's value

12 in the property, about 1.6 of the Connecticut property in

13 terms of equity, and 1 million in the other property

14 owned by the brother, and a combined value including the

15 Manhattan property of 8.6 million.  Is that fair to say?

16 Is that right?

17        MR. GILBERT:  Well, the combined value to

18 secure the bond we estimate is 8.6.  It consists of 6

19 million in cash and then the two properties.

20        THE COURT:  All right.  So if he were to flee,

21 where would the other 43 million come from?

22        MR. GILBERT:  Well, the government would have a

23 judgment for $50 million and they can take whatever steps

24 are available to them to enforce that judgment against

25 the assets of his wife who will be cosigning the bond,

Proceedings

1   and Mr. Rubin will be signing the bond, and his daughter

2   who will be signing the bond.  And Mr. Rubin's daughter

3   will forfeit his home.  I mean the financial

4   consequences, it would be devastating, devastating

5   financial consequences.  The government makes light of it

6   but I don't think there's any way to look at this

7   proposal and suggest that there wouldn't be severe

8   consequences to his wife, to his brother, to his daughter

9   in the event that he flees.

10          THE COURT:  I understand that but I notice in

11  the government's papers that they're not sure whether

12  this package is substantial to this defendant.  All

13  right?  So I understand the wife and daughter have agreed

14  to be cosigners on this bond, but at least as I read the

15  government's letter, they don't know whether this package

16  is actually substantial or not.  I think to a layman it

17  might be, but it might not be to this defendant.  Right?

18          MR. GILBERT:  Well, I think respectfully, it is

19  substantial.  I mean if he were to leave, he would be

20  putting his brother in a situation where he would be

21  forfeiting his only property, his home would be gone.

22  His wife would lose a home that she owns in Connecticut

23  and would be liable to the government for $50 million.

24  And so I don't know how else to address the Court's

25  concerns but I think in any fair reading of this it is

1  significant financial consequence on top of all of the

2  other consequences that flow from someone choosing to

3  live a life on the lam and has no country to go to, has

4  no family anywhere else, no connections anywhere else, no

5  property anywhere else.  So I think it can't be -- I

6  think the penalties would be immense.

7           THE COURT:  Understood.  Ms. McGrath, let me

8  ask you do you have that information about the net worth

9  of the daughter or the wife?

10           MS. MCGRATH:  No, your Honor.  So the defendant

11 and his wife filed joint tax returns but they're not,

12 because they don't earn income, they're not required to

13 report income but they, you know, report investments.

14 Our understanding is that the wife's life insurance

15 policy is presently valued at approximately $56 million.

16           We'll also note that even though the brother is

17 putting up his house, he would remain a trustee on the

18 trust policy which we understand to be approximately

19 $20.2 million.

20           We also want to correct two statements that

21 defense counsel made but are happy to wait until -- if

22 the Court has further questions.

23           THE COURT:  Sure, no, go ahead.

24           MS. MCGRATH:  It's quite misleading to describe

25 these as life insurance policies.  Of course they are,

Proceedings

1 but they're used as investment vehicles. During the

2 relevant period from 2014 up through 2025 the defendant

3 has taken loans against the policies of approximately

4 $63.5 million. He's deposited those loans into his

5 accounts that funded his sex trafficking enterprise. And

6 so these are very much used as slush funds for this

7 family.

8         That it's described as a life insurance policy

9 does not change the fact that it is used, you know,

10 effectively as a bank account.

11         The suggestion that the investments are

12 domestic is entirely irrelevant. The government can't,

13 you know, pierce the life insurance policy and go

14 straight to those, to whatever those investments are

15 wherever they are in the world. Instead, like the

16 defendant, we'd have to go to the Cayman Islands, the

17 life insurance policy. And it's not clear to us that

18 that's necessarily available to us.

19         For those reasons, we submit not only is it not

20 clear that the $50 million package may not be substantial

21 as to this family, but there also doesn't seem to be a

22 true likelihood of recovery.

23         And given the defendant's dangerousness in the

24 government's view and his significant risk of flight

25 including his many cell phones stashed away and the

Proceedings

1 presumption in this case, we don't think any package

2 would be sufficient, but certainly this one is not.

3              THE COURT:  All right.  Mr. Gilbert, anything

4 else?

5              MR. GILBERT:  Yeah, just briefly, your Honor.

6 I will refer the Court to the affidavit from the

7 financial advisor which is Exhibit O.  In paragraph 7 it

8 says the investment manager instructs the financial

9 institution at which the investment manager's brokerage

10 account is held which is based in the United States to

11 wire the requested funds to Crown Global.

12              So respectfully, we have submitted evidence

13 that rebuts the government's assertion that these are

14 offshore funds and that they wouldn't be able to enforce

15 a $50 million bond.  They would be able to.  And that's

16 what this affidavit shows.  And as the government just

17 said, with regard to Ms. Henry, that would reflect 98

18 percent of her holdings in that policy.

19              THE COURT:  All right.  I'm denying the package

20 as presented to the Court at this time, I'm allowing

21 defendant leave to renew in the future at the appropriate

22 time, given the government's concerns about the

23 substantialness of this package.  They've raised concerns

24 about the financial transparency of this defendant.  Also

25 given that the wife and the daughter have agreed to be

Proceedings

1  cosigners on this bond, perhaps the government may also

2  want information about their financial wherewithal as

3  well, right, because the government is concerned about

4  the substantialness of this package.  And as I said

5  earlier, $50 million sounds like a lot of money to a

6  layperson but it may not be for this defendant and his

7  family.  All right?  And given those questions by the

8  government, I'm not prepared at this time to approve this

9  package as presented to the Court.

10          I'm also mindful that the government has

11  submitted evidence in this package, or in its response to

12  the package, that this defendant did in fact lead a

13  double life and he has asked members of his family to

14  come in as cosigners on this bond when in fact they may

15  not have been aware of his activity in the past before

16  the lawsuit, civil lawsuit, had been filed.

17          All right.  So I'm not confident that at this

18  point this package will, and the family members as

19  cosigners on this bond, will hold moral suasion over this

20  defendant and assure this Court that he will appear in

21  court as directed and not be a danger to the community or

22  involve himself in witness intimidations.

23          At this time I'm denying the package

24  (indiscernible) if you address the concerns raised by the

25  government as to the financial transparency of this

Proceedings

1  package.  Okay?

2          MS. MCGRATH:  Thank you.

3          THE COURT:  Thank you, your Honor.

4          THE COURT:  All right.  Anything else for the

5  defendant?

6          MR. GILBERT:  No, your Honor.

7          THE COURT:  All right.  Anything else for the

8  government?

9          MR. GILBERT:  No, your Honor.  Thank you.

10          THE COURT:  Okay.  We are adjourned.  Thank

11  you, everyone.

12                    (Matter concluded)

13                        -oOo-

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **20th** day of **October**, 2025.

*Mary Greco*

Transcriptions Plus II, Inc.