**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KCB/RSB
F. #2017R01960

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 12, 2026

**Request to Partially Seal**

By Email and ECF

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Jennifer Powers
Criminal Docket No. 25-281 (MKB)

Dear Judge Cogan:

The government respectfully submits this letter to request that the Court deny defendant Jennifer Power's motion to modify her conditions of release, specifically the removal of her ankle bracelet. The defendant is charged with very serious crimes including sex trafficking, Mann Act violations, and tax crimes, the former of which carries with it a rebuttable presumption of detention, and a 15-year mandatory minimum sentence if convicted after trial. As detailed in the government initial detention memorandum, it only agreed to the defendant's release with a substantial bail package, including home detention with GPS monitoring, to ensure her appearance in court and the safety of the community. See ECF No. 6. The government agrees with Pretrial Services' position, as noted in the defendant's filing, that the circumstances presented in the defendant's submission are insufficient to warrant a change in bail conditions.

## I. Factual Background

### a. The Trafficking Network

The government notes the Court's familiarity with the facts of this matter and incorporates by reference the facts and arguments set forth in the government's initial detention memorandum filed on September 26, 2025. ECF No. 6. For convenience, the government

highlights herein some of the more pertinent facts as they relate to the defendant's request to remove GPS monitoring as a bond condition. See ECF No. 113.

As detailed in the government's initial detention memorandum, between at least 2009 through 2019, Rubin, Powers and others operated an extensive network whereby they recruited women—often former Playboy models—to fly to New York to engage in sex with Rubin in exchange for money, often relying on force, fraud and coercion. The commercial sex acts involved bondage, discipline, dominance, submission and sadomasochism ("BDSM"). Rubin and Powers spent more than $1 million of Rubin's money funding the operation, and during the same period Powers and her family profited in the millions from Rubin.

Before 2011, the commercial sex acts primarily took place at luxury hotels in Manhattan. From 2011 to 2017, Rubin leased a two-bedroom penthouse near Central Park (the "Penthouse") and, with Powers's assistance, transformed a second bedroom into a sex dungeon (the "Dungeon"). The Dungeon was soundproofed; had a lock on the door; and was outfitted with BDSM instruments, devices and furniture, much of which Powers had procured. For example, on July 30, 2012, Powers emailed Rubin with details of how she had furnished the Dungeon, noting, "I've put chains on the four points of your cross and four points of the Dungeon bed. On the end of each chain is a cuff. . . . I've done this bc it will be VERY easy to just throw someone on the cross or on the bed and just strap them into the 'premade' chains and cuffs."[1] Powers maintained the Dungeon, cleaning it between uses, and restocking the equipment.

Rubin relied on Powers and several other co-conspirators to recruit women for commercial sex. Rubin saw women for commercial sex multiple times a week, often day after day. See, e.g., Jul. 13, 2015, email from Rubin to Powers ("I might see someone EVERYDAY this week, (except thurs)."); Nov. 18, 2015, text messages between Powers and Jane Doe #1 (noting another woman was staying at the Penthouse the day before Jane Doe #1 was flying in to have commercial sex with Rubin, "so I need to coordinate carefully"). Rubin kept Powers apprised of who he was seeing and when, and often provided her with graphic details of the sex acts.

Powers was primarily responsible for the logistical aspects of the trafficking network, including recruiting women to have sex with Rubin for money; arranging flights for the women to travel to New York, typically through airports in Queens, New York; securing non-disclosure agreements ("NDAs") from the women; conferring with the Penthouse building doormen to ensure the women could access the Penthouse, and would not overlap with one another; paying the women after the commercial sex acts; and managing fallout with the women after their encounters with Rubin. Powers maintained notes of the women who had engaged in commercial sex with Rubin and whom she paid, and whether Rubin enjoyed the encounters.

---

[1] All errors and ellipses contained in quotes are original, unless otherwise indicated. In case citations, all citations and quotation marks are omitted and alterations adopted.

Powers paid the women in amounts dictated by Rubin, using Rubin's money. At times, Powers artificially structured transactions to women, refusing to send a single payment of $10,000 or more, seemingly in an effort to avoid financial scrutiny. Powers also refused to pay women by wire transfer, instead opting for applications like PayPal (notwithstanding the sizable fee associated with those transactions).

Rubin and Powers kept a stash of blank NDAs in a safe in the Penthouse, which they required women to sign. Women were not provided with a copy of the NDAs before being required to sign. Women were required to attest that they were not under the influence of drugs or alcohol at the time of signing, when at times they had been provided with alcohol and/or drugs by Rubin, Powers or their co-conspirators before being presented the NDA.

The NDAs purported to require, among other things, that the women assume the risk of the hazards and injury of all BDSM encounters with Rubin, both historic and prospective; prohibited the disclosure of information about the BDSM sex with Rubin; and required the payment of $500,000 to Rubin as a penalty for breach. The NDA represented the sexual activity as "Sadomasochistic (SM) activity that can be hazardous and on occasion cause injury to my person." However, Rubin, Powers and their co-conspirators knew that the NDAs grossly misrepresented the manner and degree of violence the women would endure, which caused women significant pain, left lasting bruising, and on some occasions required medical treatment. In an August 2013 email, Rubin acknowledged that the sexual activity would cause the women "a lot of pain," would make them cry, and would leave them "sore and bruised for probably a week." The abuse Rubin inflicted on victims—many of whom were gagged and restrained in the locked Dungeon during the encounters—included electrocuting their genitals; probing their genitals with pool cues and utensils; beating their breasts and bodies with closed fists; and performing violent sex acts on their bodies while they were unconscious.

Although Powers was not present during the commercial sex acts, Rubin kept Powers apprised of who he was seeing and when he was seeing them, and he often provided her with graphic details of the sex acts. For example, in January 2015, Rubin emailed Powers about commercial sex acts with Jane Doe #1 and noted that he used "the cross"—furniture in the Dungeon to which a woman could be restrained. Powers replied, "I can only imagine what you did to her on that cross!!! Did you shock her pussy??" Rubin replied in the affirmative, complained that his electrocution device was losing its strength, and provided other graphic details of the encounter. Rubin boldly and regularly discussed details of his criminal sexual activity from his work email account, while employed at a high-powered financial firm in Manhattan.

The trafficking network at times preyed on women who were desperate, including women who had previously been sexually abused, who were financially desperate, and who suffered from addiction. For example, Rubin probed victims, including Jane Doe #2 and Jane Doe #10, about prior abuse they suffered. Additionally, Rubin learned that Jane Doe #4 had a sick child before he violently brutalized her body. Similarly, Jane Doe #10 suffered from addiction, which Rubin and Powers knew and acknowledged in text messages. In June 2014, before commercial sex with Rubin, Jane Doe #10 told Rubin she was "desperate," was in a

"really tough" position, was sleeping on a couch, and needed money "badly." She also indicated that she would take "plenty of Valium" to endure his abuse. Rubin agreed and recruited a co-conspirator ("Co-Conspirator-1") with whom to abuse Jane Doe #10. Rubin described Jane Doe #10 to Co-Conspirator-1 as hating "submissive but she's brokke and says she''11 do anything!" He reiterated, "She hates it, but she's soooo desperate!! We've got to make her cry!!!" Jane Doe #10 told Rubin she was "ready," and Rubin replied, "Ur not, bbut ur desperate and thts good."

Moreover, Rubin, Powers and their co-conspirators relied on women being intoxicated with drugs and/or alcohol before the sexual encounters with Rubin. For example, in September 2011, while at a restaurant before BDSM sexual activity, Rubin told another woman to give Jane Doe #10 drugs to, in sum and substance, take the edge off, and then in June 2014, before another encounter, he told Jane Doe #10 to "Get drunk!" after she had promised to take sufficient Valium to tolerate the activity. In 2015, Rubin provided Jane Doe #2 with a sedative so that he could enact a rape scene, which caused her to go in and out of consciousness while he sexually abused her. In October 2016, Jane Doe #5 was encouraged to use cocaine before she was solicited to engage in commercial sex. Rubin acknowledged in text messages to Powers that there had been a "[l]ittle bit of coke," and Powers replied that when she showed up to the Penthouse later that morning, there were "drugs all over the condo." In April 2016, a victim ("Victim 1") confided in Powers that she "took a weird pill last night with H and I am super messed up," which Powers confirmed was Vicodin. Powers then texted Rubin, "No one can drink for 6 hours straight…then take 2 vicodins, you were egging her on." Additionally, in September 2016, Powers texted Rubin that over the course of a week, multiple women had vomited from excessive alcohol consumption. And in May 2018, Rubin asked Jane Doe #6 if she did drugs before he abused her, indicating, in sum and substance, that now would be the time if she did. Powers was clearly aware that women often used alcohol and drugs to cope, for example commenting with surprise in an email from January 2015 when she learned that Jane Doe #1 seemed to be able to tolerate Rubin's abuse without being on drugs. Additionally, in September 2016, Powers texted Rubin that over the course of a week, multiple women had vomited from excessive alcohol consumption.

The trafficking network relied on a recruitment system in which women were misled regarding the manner and degree of abuse they would endure. As discussed above, the NDAs women were provided grossly misrepresented the manner and degree of abuse Rubin would inflict. Other times, women were recruited on the basis they could use a "safe word" to make the abuse stop, but during their commercial sexual encounter with Rubin, they were either unable to utter the safe word because they were gagged or, when they did say it, Rubin did not respect it. Other times, women simply said "no" or "stop," but Rubin persisted. Still other times, women lost consciousness, but Rubin continued to sexually abuse them.

Moreover, in September 2016, in anticipation of a BDSM sexual encounter between Rubin, Jane Doe #9 and Jane Doe #4, Rubin told Jane Doe #9, in reference to Jane Doe #4: "I want to hurt her." "I want to abuse her for hrs." "I don't care if she screams [laughing emoji][.]" "This is going to be so fun!" Then, Jane Doe #4 was told that there would be a safe word that she could use to make the conduct stop. However, Jane Doe #4 was tied and gagged,

and could not say the safe word. Rubin and Jane Doe #9 violently brutalized her body, punching her breasts and head repeatedly. The abuse did not end until Jane Doe #4 was able to remove enough of the gag to bite Rubin's finger. Then, Rubin texted Powers:

RUBIN: It got very rough jenn, we need to be VERY VERY VERY nice….
RUBIN: Very important. Trust me.
RUBIN: Very important
POWERS: OK. I am being nice. I just hope you know what you're doing

Similarly, in October 2016, a female co-conspirator ("Co-Conspirator-2") provided Jane Doe #5 with cocaine and then proposed that Jane Doe #5 engage in a threesome with her and Rubin during which Jane Doe #5 would not have to have sex with Rubin. On that basis, Jane Doe #5 agreed. Then, Jane Doe #5 was brought to the Dungeon; locked inside; and physically restrained to the BDSM furniture, while she kicked, fought and screamed to be released. At one point, Co-Conspirator-2 had to sit on Jane Doe #5 to restrain Jane Doe #5. Notwithstanding Jane Doe #5's violent protest, Rubin sexually and physically abused Jane Doe #5.

Women suffered significant pain, bruising and psychological trauma from Rubin and his co-conspirators' abuse, sometimes causing them to seek medical treatment. On multiple occasions, women confided in Powers regarding what Rubin made them endure, believing that Powers cared about their well-being. In reality, Powers made excuses for Rubin, blamed the women for Rubin's behavior, or provided damage control by encouraging women to tend to their injuries with bruise cream and ice, or in some instances paying off the women in consultation with Rubin. For example, Jane Doe #4's breast implant flipped due to the abuse she suffered, and she sent a video to Powers showing some of the damage. Rubin and Powers agreed to pay Jane Doe #4 tens of thousands of dollars. Jane Doe #3 also confided in Powers regarding how bruised her body was because of Rubin, and Powers told her to buy Arnica cream. Another time, Jane Doe #3 told Powers that Rubin tried to force Jane Doe #3 to perform oral sex on him in a taxi, and in response Powers said, in sum and substance, that Powers had told Jane Doe #3 not to let Rubin get drunk. Likewise, after Jane Doe #6's encounter with Rubin, she developed a seroma on her breast and could not work due to the bruising, which she told Rubin. Similarly, Rubin's abuse caused trauma to Jane Doe #10's buttocks, causing significant pain, for which she sought medical treatment.

b. <u>Obstruction of Justice & Witness Tampering</u>

To protect the trafficking network, Rubin and Powers attempted to tamper with witnesses and obstruct justice, dissuading victims from turning to law enforcement or seeking legal recourse, and influencing or attempting to influence their testimony.

For one, the NDAs purported to require women to pay $500,000 to Rubin if they disclosed information about their sexual abuse. Rubin and Powers engaged in more explicit obstruction as well. For example, in connection with a fight between [redacted] and [redacted], stemming from Rubin's abuse of [redacted] charges were filed against

[redacted][2] Powers instructed [redacted] that Rubin would pay her legal fees, provided [redacted] lie to the police about who leased the Penthouse, get rid of the drugs in the Penthouse, and keep Powers and Rubin's names out of the case (to which they were not parties). [redacted] complied and lied to the police. In a text message to Rubin, Powers stated with regard to [redacted]s lawyer, "We probably need someone 'good' since the reason they fought was over you…I'm not sure if anything else would be brought up, drugs, sex, etcccc." Powers also sent [redacted] an email to share with [redacted]'s lawyer, authorizing the lawyer to share all information with Rubin and Powers's own attorney (the "Lawyer"). The email Powers drafted read: "I am writing to express authorization for you to discuss my case with another attorney by the name of [Lawyer]. You have my express permission to share any and all information in regards to my case with [Lawyer]." Powers was adamant that [redacted] send the email, which [redacted] did.

Similarly, in October 2016, Rubin suggested that Powers simply offer to pay off [redacted] For example, he wrote, "after things cool down next week, I'd like to offer [[redacted]] 1k to drop the charges against [[redacted]]. We don't need r names thrown around." In December 2016, he again suggested to Powers, "I wonder if we cann get hold of [[redacted]] and just pay herto drop charges. ?" Powers characterized the proposed payment as a "bribe."

In September 2017, the Lawyer was provided a copy of a draft complaint in what became a civil sex trafficking lawsuit against, among others, Rubin and Powers. <u>See</u> <u>United States v. Howard Rubin et al.</u>, No. 17-CV-6404 (BMC) (E.D.N.Y.) (the "Civil Case"). The draft complaint detailed sex trafficking at the Penthouse. That evening, Powers had numerous calls with the Lawyer and also a call with Rubin. Later that evening, Powers contacted 1-800-GOT-JUNK. The company was scheduled to clear out items from the Penthouse on September 22, 2017, to discard what Powers represented to be "work out equipment…5 items" that would need to be taken apart—seemingly in reference to the BDSM furniture in the Dungeon—thereby discarding evidence of Rubin and his co-conspirators' crimes. Then, the same service was hired to remove "Approx 10 garbage bags of debris" from the Penthouse on October 20, 2017. Powers paid for the junk removal service using her joint credit card with Rubin.

Further, Rubin advised Jane Doe #7, whom he saw for commercial sex between approximately 2014 to 2019, and who was <u>not</u> a plaintiff in the Civil Case, that pursuant to his arrangements, a hitman was contacted on the dark web to target women who had filed a civil suit against him. Specifically, as Jane Doe #7 reported to law enforcement:

---

2 [redacted]

> He once made comments to [Jane Doe #7] about hiring a hitman to target the women who had filed the civil suit. He had looked on the dark web and made contact with a hitman, but said that it was too much money. This seemed very real to [Jane Doe #7]. She did not think RUBIN was lying. He was getting off on talking about this. He said these women were stupid whores he met on Instagram. . . . [Jane Doe #7] was willing to testify to anything she told the Agents.

EDNY_0000001-9. <u>See also</u> EDNY_0000010-15 ("RUBIN once implied to [Jane Doe #7] that he had asked POWERS to find a hitman for the women who sued him, but the guy wanted $850,000, and they thought that was too much. He said the dollar amount wasn't worth it. He also made comments about paying a girl to make her go away.").

c. <u>Financing the Trafficking Network & Financial Crimes</u>

Rubin and Powers also engaged in financial crimes in connection with their operation of the trafficking network. In a deposition in connection with the Civil Case, Powers testified under penalty of perjury that Rubin paid her a monthly wage of $10,000 from 2011 to 2014, and $15,000 from 2015 to 2017. However, bank records reflect that Rubin in fact sent Powers millions of dollars during that period, far more than she had claimed. Powers layered those transactions through several of her accounts, for no apparent purpose other than to obscure that the source of the funds was Rubin.

Indeed, since approximately 2012, Rubin has funded virtually all aspects of Powers and her family's lifestyle. Among other things, he has paid for the rent on their Manhattan apartment; her children's private school tuition; the downpayment and mortgage on their Texas-based home after the Powers' moved to Texas in 2020; her legal fees in connection with the Civil Case; and since 2018, he has directly paid her credit card bill.

Notably, after the filing of the Civil Case, the structure of Rubin and Powers's financial relationship fundamentally changed, but the substance did not. Instead of wiring Powers money to her bank accounts, Rubin began funding her lifestyle directly, largely by making mortgage payments and paying off her and her husband's credit card bill. Between 2018 to 2023, Powers and her husband charged more than $500,000 per year to their credit card, which Rubin paid, totaling payments in excess of $9 million for that time period. Between at least 2014 to the present, neither Rubin nor Powers have reported any of the money Rubin has provided to Powers and her family on their tax filings with the Internal Revenue Service, which they had an obligation to do.

Moreover, Rubin and Powers have lied to financial institutions to conceal the nature of their relationship. For example, to secure the mortgage on her home in Texas, which Rubin co-signed, Powers falsely told the bank that Rubin was her "uncle." Then, Rubin attested to a financial statement in June 2020, claiming he was not a party to litigation. In fact, he was party to the Civil Case, among others; had been deposed in the Civil Case, as had Powers; and he had sat for the depositions of all plaintiffs that had been deposed. Then, in April 2022, during

the middle of the jury trial in the Civil Case, after he had testified, he attested to a second financial statement submitted to the bank, which did not correct his prior material misrepresentation that he was not party to litigation.

II. Procedural Background

As noted above, in November 2017, Rubin and Powers were sued in the Civil Case for civil sex trafficking, among other causes of action, in a case that proceeded to trial in March and April 2022. A jury found Rubin liable and Powers not liable. Further, as noted above, the instant matter is different in many respects from the civil case, including the number of Jane Does, not all of whom were parties to the civil suit, and the additional tax crime charges.

On September 17, 2025, a grand jury sitting in the Eastern District of New York returned a ten-count indictment charging Rubin and Powers with sex trafficking, in violation of 18 U.S.C. §1591(a), transporting women in interstate commerce for prostitution, in violation of 18 U.S.C. § 2421(a), and, as to Jennifer Powers, filing false tax returns, in violation of 26 U.S.C. § 7206.

Powers faces a mandatory minimum sentence of 15 years' imprisonment and a maximum sentence of life for sex trafficking; and a maximum sentence of 10 years imprisonment on each count of transporting women in interstate commerce for prostitution.

On September 26, 2025, Power was arrested at her home in Southlake, Texas and made her initial appearance in the Northern District of Texas on September 29, 2025, where the conditions of release, agreed to by the defense before the hearing, were set by Magistrate Judge Jeffrey L. Cureton, including home detention with GPS monitoring. Despite the government's request for a Secured Bond, Judge Cureton released the defendant with all of the agreed upon conditions, except the Secured Bond, which he did not impose. See ECF. No. 14. The same day the government wrote to this Court to request that the Court modify the bond to include the consented-to Secured Bond condition precisely because it was part of the full panoply of agreed upon conditions that the government determined was substantial enough to ensure the defendant's appearance in court as required and the safety of the community. Id. The next day Your Honor granted the government's request. ECF No. 15.

On October 1, 2025, the defendant appeared before the Honorable Magistrate Judge Peggy Kuo, who imposed the same agreed upon conditions including an $850,000 bond, co-signed by her parents, and secured by defendant's parent's home and interest in investment property, and various conditions of release including, home detention with GPS monitoring. ECF. Nos. 24 – 25.

III. Argument

The charged offenses are unquestionably serious and violent, demonstrating the defendants' dangerousness and risk of flight. Indeed, given the nature of the charges, a presumption of detention applies. See 18 U.S.C. § 3142(e)(3)(D). Notwithstanding the

rebuttable presumption, the government agreed to a stringent bail package that was sufficient but not greater than necessary to ensure her appearance in court and the safety of the community. As discussed in our initial detention memorandum, the government submitted to the Court that Powers only be released "if and when she satisife[d] appropriate conditions" including home detention with GPS monitoring.[3] ECF No. 6 at 14.

Further, the government has not opposed various modifications for family events including her sons birthdays (ECF Nos. 59, 88), family events (ECF Nos. 99, 110), son's sports activities (ECF No. 105), and attending a movie on Father's Day (ECF No. 108). The government has been, and will continue to be, more than accommodating in balancing the requests of the defendant, and the need to ensure the safety of the community and assurance of her appearance in court.

Compliance with the strictures of pre-trial release is expected of the defendant, particularly in a case of this nature where the government has proffered evidence of the defendant's involvement in a serious and violent sex trafficking operation, and obstructive conduct as detailed above. Namely, Powers instructed a Jane Doe, [redacted], to lie to the police to protect herself and co-defendant Rubin. Almost immediately after the filing of the civil suit, she got rid of the sex and torture toys by calling and paying 1-800-GOT-JUNK.

As described above, Powers financially benefited from the sex trafficking operation and played a vital role in its longevity and concealment. Specifically, Powers profited to the tune of millions of dollars, which she accepted for running all aspects of Rubin's sex trafficking network. She engaged in sophisticated techniques to avoid financial scrutiny of her payments to women for their commercial sex work, and for Rubin's payments to her, including layering and artificial structuring. And she lied during her deposition about the amount of money she received from Rubin, misrepresenting the total figure by millions. Indeed, to this day, Rubin and Powers continue to engage in financial crimes—including misleading the bank

---

[3] The cases cited by the defendant are distinguishable and unpersuasive. For example, in United States v. Diaz, No. 17-CR-227 (VEC), 2018 WL 5282882 (S.D.N.Y. 2018) the court found that the statute mandating the defendant wear an ankle monitor was unconstitutional as applied to him. Further, the Diaz court noted that Diaz was charged with a low-level offense, the conviction would result "in a relatively short term of incarceration (if any)" and that the government did not argue that Diaz posed a danger to any person or to the community. Diaz, 2018 WL 5282882, *3. In United States v. Lyons, No. 91-CR-889, 1991 WL 278954 (S.D.N.Y. 1991), the defendant was not charged with crimes subject to a rebuttable presumption of detention, and the government did not suggest that Lyons was a danger to the community. As discussed herein, sex trafficking carries a rebuttable presumption of detention, the defendant faces significant prison time if convicted after trial, and the current bail conditions are to ensure both the safety of the community and her appearance in court as required. Additionally, as noted below Pretrial Services opposes the motion.

that issued Powers's mortgage as to the nature of their relationship and Rubin's involvement in litigation, and failing to disclose millions of dollars to the Internal Revenue Service.

Rubin and Powers used both financial and legal coercion to silence the women, threatening legal recourse and public shaming.

As the Court is aware from the government's initial detention memorandum, the weight of the evidence proving the defendants' guilt is strong, creating a powerful incentive to flee. Suffice it to say, the crimes were violent, extensive and sustained, together spanning more than a decade. The victims were plentiful. Many were targeted because of their own vulnerability—histories of abuse, desperate financial need and addiction, among other things. The weight of the evidence creates a strong incentive to flee, particularly where the defendants are faced with mandatory minimum sentences of 15 years imprisonment and maximum sentences of life imprisonment. See United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022) ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (finding maximum sentence of 15 years "sufficient to provide him with a strong incentive to flee").

The posture of the case further militates the status quo. The government has produced voluminous discovery and anticipates additional voluminous discovery in the upcoming weeks as well as early production of 3500 materials. Indeed, the Court designated this case as complex on March 16, 2026. Given the defendant's history of obstructive conduct, and her complicity in the sex trafficking operation, at this juncture there is a serious risk that the defendant will "obstruct justice," "threaten, injure, or intimidate" prospective witnesses, and attempt to do the same. 18 U.S.C. §1342(f)(2)(B). Accordingly, the government opposes the defendant's request to remove the strictures of the pre-trial bail conditions.

The government has conferred with Pretrial Services who has informed the government that "Pretrial does not consent to removal of the bracelet as there have been no changes in circumstance that would warrant the removal of a bracelet. While there are no reported issues regarding compliance, the defendant is expected to be compliant when released from court on a bond." Pretrial has also informed the government that while the ankle monitor must remain on the defendant's ankle, they can determine if the monitor can be loosened to alleviate any discomfort. [redacted] Further, with respect to finding full-time employment, this alone is not persuasive to

reduce a critical component of the bail package, particularly where there are jobs that could both provide the defendant with full-time employment and not require a change in bail conditions.

## V. Conclusion

In light of the above, the government submits that the Court deny the defendant's request to remove electronic monitoring.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Kayla Bensing
Raffaela S. Belizaire
Assistant U.S. Attorneys
(718) 254-7000