Schlam Stone & Dolan LLP
26 Broadway, New York, NY 10004
Main: 212 344-5400
Fax: 212 344-7677

Jolene F. LaVigne-Albert
Partner

212 612-0685
jlavignealbert@schlamstone.com

**Rotunno & Giralamo**

140 S. Dearborn Street, Suite 404
Chicago, Illinois 60603

Donna Rotunno
Partner

(708) 615-9400
donna@rotunnogiralamo.com

**Cheronis & Parente LLC**

140 South Dearborn Street, Suite 404
Chicago, Illinois 60603

Damon M. Cheronis
Partner

(312) 663-4644
damon@cheronislaw.com

August 13, 2026

**<u>REQUEST TO FILE UNDER PARTIAL SEAL</u>**

**<u>BY EMAIL AND ECF</u>**
The Honorable Brian M. Cogan
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** *U.S. v. Rubin et al.*, Case No.: 25-CR-00281 (BMC)

Dear Judge Cogan:

We write on behalf of Jennifer Powers in response to the government's letter (ECF Doc. Nos. 114 & 115, "Gov. Opp.") opposing Ms. Powers's motion for removal of her ankle monitor. The government's opposition largely mirrors prior submissions by the government regarding the alleged relevant facts of this case without specifically addressing the narrow question presented, that is, whether an ankle monitor remains the least restrictive condition necessary for Jennifer Powers.

*First*, the government's reliance on the nature of the offense here is insufficient as the presumption of detention under 18 U.S.C. § 3142(e)(3)(D) was successfully rebutted by Ms. Powers. The sole question is whether ankle monitoring remains the least restrictive means necessary for her compliance. There is no statutory requirement that a defendant awaiting trial on sex trafficking charges involving adults be subject to ankle monitoring. If Congress had wanted to impose mandatory ankle monitoring, it could have done so, just as it did for defendants awaiting trial for sex offenses involving minors (*see* 18 USC § 3142(c)(1)(B)). But it did not. Moreover, with respect to the nature of the offense, although the government claims that the "crimes were violent," it is undisputed that Ms. Powers was never present or in any way involved in any sexual encounter between Mr. Rubin and the Jane Does, and there was never any allegation that Ms. Powers engaged in violence—facts that are relevant when assessing the safety of the community.

Although the government claims that the "victims were plentiful" and that the alleged crimes were "sustained, together spanning more than a decade," the defense's view of those facts is that they tend to show that this was not sex trafficking at all, but rather years of consensual commercial sex between adults. The government does not specifically address why it believes the ankle monitor is necessary in addition to the other conditions Ms. Powers is and will continue to be subject to, including her continued home confinement (except as approved by Pretrial Services), significant appearance bond [redacted], and her $500 spending limit. Moreover, although the government glosses over it now, it did say upon Ms. Powers's arrest that "a significant bond package, secured by assets that have no connection to Rubin" would be sufficient to "secure her appearance at trial and the safety of the community." (ECF No. 6 at 12.). That bond package has been entered. Thus, we submit that the government has failed to show that an ankle monitor remains part of "the least restrictive" sets of conditions necessary to assure Ms. Powers's appearances and the safety of the community.

*Second*, as to the "weight of the evidence," we wholly disagree that this factor weighs against Ms. Powers. (Gov. Opp. at 10.) We have filed today, at ECF Doc. 116, Ms. Powers's response to the government's *Curcio* submission, which addresses the government's substantive allegations against Ms. Powers. As that letter details, Ms. Powers was found not liable of very similar sex trafficking allegations after a civil trial, and the evidence strongly supports that she is innocent. To avoid repetition, we incorporate those arguments by reference here. For purposes of this motion, suffice it to say that Ms. Powers never participated in, or witnessed any sexual encounter between the Jane Does and Mr. Rubin. Moreover, the Jane Does, almost all of whom had open channels of communication with Ms. Powers, never claimed that they had been coerced or sexually assaulted by Mr. Rubin. To the contrary, they often indicated to Ms. Powers that they had a great time and were eager to return. To the extent the Jane Does mentioned bruising, that was expected given the BDSM nature of the sexual encounters; it was not an indicator of coercion. Nor did Ms. Powers ever "recruit" any of the Jane Does for commercial sex. Indeed, the government makes that claim (Gov. Opp. at 2) even though there is no support for it: the Jane Does were introduced to Mr. Rubin by third parties, not by Ms. Powers.

As particularly relevant to this motion, and as further detailed in our *Curcio* submission, the government's allegation of "obstruction of justice and witness tampering" is wholly unsupported. Indeed:

1. As this Court found in the civil case, the NDAs that the civil plaintiffs/Jane Does were asked to sign *did not* obstruct justice or amount to witness tampering.

2. Ms. Powers *did not* instruct [redacted] to "lie to the police" in exchange for payment of her legal fees: to the contrary, text messages show that Ms. Powers counseled [redacted] to call the police if she had any questions, to make sure not to miss any of her court appearances, and to trust her lawyer's advice, including if it meant going

to trial and airing out what happened on [redacted] between [redacted] and [redacted] at Mr. Rubin's apartment.

3. That Ms. Powers *asked* [redacted] if she would be willing to have her attorney speak to the attorney representing Ms. Powers and Mr. Rubin in August 2017 regarding a common issue—threats of extortion by conman Bob Aloi—did not obstruct justice or amount to witness tampering. [redacted] could have said no. The notion that Ms. Powers would go through [redacted] lawyer to try to "tamper" with her defies logic.

4. When Mr. Rubin "suggested that Powers simply offer to pay off [redacted]", she declined in no uncertain terms. Shockingly, the government's submission omits the most critical point of that communication where Ms. Powers texts to Mr. Rubin: "I *don't think* we should bribe her."

5. As to the disposal of the content of the apartment, there were many logical reasons why, at that time, Ms. Powers would arrange for the disposal of those items. Notably, the lease on the apartment was ending. In any event, this Court denied a spoliation instruction to the jury in the civil case arising out of those events. Of note, Ms. Powers and Mr. Rubin produced, in the civil case, many photographs of the sex toys and the furniture that used to be in the second bedroom in the apartment. There was never any effort to hide that there were sex toys and furniture in the second bedroom at all relevant times. Indeed, Ms. Powers was cross-examined about these events at the civil trial, which nevertheless resulted in a verdict of no liability as to her.

6. The government mentions an allegation by Doe #7 that Mr. Rubin would have allegedly told her he had contemplated hiring a hitman to target women who had filed a civil suit against him, and in one of those renditions by Doe #7, Mr. Rubin would have allegedly told her he had asked Ms. Powers to look for a hitman. The government telling the Court that Doe #7 told an agent that Mr. Rubin told her he had told Ms. Powers anything about finding a hitman is a dizzying level of hearsay that establishes nothing. Ms. Powers had no involvement with anything related to a hitman, and the inclusion of that allegation in the government's opposition is unfairly prejudicial and should be wholly disregarded.

7. The government's allegation that Ms. Powers played a "vital role" in "concealing" the alleged "sex trafficking operation" is likewise unsupported. The Jane Does were all adults and U.S. citizens. At any time during the *many years* they had sexual encounters with Mr. Rubin, they could have called the police to report his conduct. None of them ever did. The one time the police was called was when [redacted] reported that [redacted] assaulted her. [redacted], apparently willing to involve law

> enforcement when necessary, had ample opportunity to report any alleged misconduct by Mr. Rubin to the police had she so desired. Ms. Powers never spoke to [redacted], let alone tried to silence her. Although the government emphasizes a supposed attempt by Ms. Powers to silence [redacted] after this incident in [redacted], [redacted] had not had sex with Mr. Rubin on this occasion, which Ms. Powers knew. Rather, [redacted] had had sex with Mr. Rubin. The government's theory that Ms. Powers tried to silence [redacted] again defies logic.

Importantly, these events allegedly took place *a decade ago*. None of these allegations are relevant to the question of whether ankle monitoring remains necessary to assure Ms. Powers's appearances and safety of the community today. It is undisputed that Ms. Powers has fully complied with the conditions of her release, including the prohibition against speaking to any witness in the case outside the presence of counsel. In any event, an ankle bracelet would not stop Ms. Powers from doing that, and thus the government's argument about supposed obstruction and witness tampering is not relevant to the sole issue before the Court.

*Third*, the government's allegations about tax fraud are similarly not relevant to the current motion. Defendants indicted for tax fraud are rarely released on conditions that include electronic monitoring as they await trial.

*Fourth*, the government does not cite any authority for its argument that the defense must show a substantial and undefined "change in circumstances" to warrant removal of an ankle monitor. The proposition that "conditions of bail should properly be modified if a substantial change in circumstances as they existed at the time bail was fixed is clearly shown," *United States v. Falcetti*, No. 02 CR 140(ILG), 2002 WL 31921179, at *1 (E.D.N.Y. Oct. 31, 2002), is not the same as what the government argues, *i.e.* that conditions of bail cannot possibly be modified absent a specific "substantial change in circumstance as they existed at the time bail was fixed." Although not binding on this court, we respectfully submit that the court's analysis in *United States v. Hutchins*, 298 F. Supp. 3d 1205 (E.D. Wis. 2017) is on point:

> [T]he government's arguments . . . are unavailing. First, it repeats the contention made to Magistrate Duffin that compliance with release conditions is not enough, standing alone, to warrant modification of those conditions. . . . The government's view is contrary to the normal practice in this and other district courts around the country. **When defendants establish that they will abide by their obligation to appear in court, logic dictates that the justification for imposing the existing release conditions lessens**. . . . Put differently, if the Bail Reform Act requires no more than the least restrictive conditions needed to reasonably assure the defendant's appearance, then **consistent compliance with existing conditions counsels in favor of reducing their severity on the theory that lesser conditions will suffice.**

> . . .
>
> . . .
>
> In the end, the government's repeated challenges to the lessening of Hutchins' release conditions represent a continuing attempt to turn the applicable standards upside down. **The government believes that any change in release conditions must be justified by new facts proffered by the defense. To the contrary, the magistrate's conclusion is consistent with the Court's ongoing obligation under Section 3142(c) to ensure that only the least restrictive conditions necessary to reasonably assure Hutchins' appearance are employed.**

(Emphasis added.)

In any event, circumstances *have changed* since the bracelet was first imposed: (1) Ms. Powers has [redacted] and the bracelet exacerbates that condition; and (2) the bracelet has seriously impeded her job seeking efforts, including one pending full-time job offer she will almost certainly not be able to pursue if she has to continue wearing the bracelet.

Federal courts in New York have agreed to remove an ankle bracelet or otherwise modify conditions of release to allow defendants to take a job. (*See* Dkt. 112/113 at 5 (citing *Boyd*, *Lyons* and *Lloyd*).) The government claims that there "are jobs that could both provide the defendant with full-time employment and not require a change in bail conditions," but Ms. Powers has not found any such employment opportunity, despite trying. (*See* Dkt. 112/113 at 5-6.) She cannot work in the field she trained for, and the accusations against her in this case—which we submit are unwarranted—make it very difficult for her to find any job.

The government's proposed solution of loosening the bracelet is one that has been proposed previously, and is not helpful, because loosening it makes it hit on Ms. Powers's ankle bone, making it painful for different reasons when she walks.

* * *

Finally, the consequences for Ms. Powers should she flee would be severe. She has [redacted], she has a good relationship with [redacted], she has surrendered her passport, and she is not going anywhere. The one place she would like to go, while she awaits trial, is to work. We respectfully ask the Court to lift the condition requiring Ms. Powers to wear an ankle monitor.

Respectfully submitted,

/s/ Jolene LaVigne-Albert

**Schlam Stone & Dolan LLP**
Jolene F. LaVigne-Albert
Angela Li
26 Broadway
New York NY 10004
212 344-5400
jlavignealbert@schlamstone.com
ali@schlamstone.com

/s/ Donna Rotunno

**Rotunno & Giralamo**
Donna Rotunno
140 S. Dearborn Street,
Suite 404
Chicago, Illinois 60603
(708) 615-9400
donna@rotunnogiralamo.com

/s/ Damon Cheronis

**Cheronis & Parente LLC**
Damon M. Cheronis
140 South Dearborn
Street, Suite 404
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com